Margaret S. HALL, Plaintiff–Appellee,

v.

**MARION SCHOOL DISTRICT NUMBER 2, Defendant–Appellant.**

No. 93–1199.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 25, 1993.

Decided July 26, 1994.

184

Kenneth Lendren Childs, Childs & Duff, P.A., Columbia, SC, argued (David T. Duff, David E. Dubberly, on brief), for appellant.

Jeremiah Andrew Collins, Bredhoff & Kaiser, Washington, DC, argued (Susan D. Carle, on brief), for appellee.

Before LUTTIG and WILLIAMS, Circuit Judges, and SPROUSE, Senior Circuit Judge.

Affirmed by published opinion. Judge WILLIAMS, wrote the opinion, in which Judge LUTTIG and Senior Judge SPROUSE joined.

1. Although Hall sued the Marion County School District Number 2, her complaints are against actions taken by the District's School Board.

## OPINION

**WILLIAMS, Circuit Judge:**

Marion County School District Number 2 (District) appeals the district court's order, —— F.Supp. ——, requiring it to reinstate Margaret S. Hall to her position as a special education teacher, and to pay her damages and attorney's fees. We affirm.

Margaret S. Hall brought an action in federal district court alleging that the District violated her First Amendment rights under 42 U.S.C. § 1983 (1988), by terminating her from her teaching position. The district court, after a bench trial, held that Hall was not precluded from raising her First Amendment claims in federal court, and that the District, through the actions of the District's School Board (Board), did in fact terminate her employment in violation of her First Amendment rights.[1]

### I.

The record evidence before the district court demonstrates the following facts about this controversy which occurred during the 1990–91 school year. Margaret S. Hall was a special education teacher at North Mullins Primary School, located in Marion County, South Carolina. When terminated, Hall had been a teacher for more than twenty-two years and had consistently received excellent teacher evaluations. On December 5, 1990, Hall wrote the first of a series of letters to the editor of the local newspaper, the *Marion Star–Mullins Enterprise*. The letter congratulated three members of the Board for voting against sending six Board members to a conference in San Francisco, California. In the letter, Hall expressed her outrage at the willingness of the six Board members to spend almost $10,000 of taxpayers' money on a "luxurious vacation." At the conclusion of Hall's letter, the editor of the newspaper noted that Dr. William Foil, Superintendent of the District, refused, for "security reasons," to name the Board members who had requested to attend the conference.

Marion County is divided into four school districts, and North Mullins Primary School is in District Number 2.

Because Foil declined voluntarily to submit the names, Hall and her husband, Ronald Hall, filed a Freedom of Information Act (FOIA) request to procure the names of the Board members. Hall wrote another letter to the editor criticizing Foil for refusing to name the Board members, and stated that she would submit the names as soon as she obtained them. Hall continued writing letters to the editor of the *Marion Star–Mullins Enterprise*, criticizing the Board's handling of funds, and her letters to the editor were also published in the *Florence Morning News* and *The State* newspapers.

Foil testified at trial that both he and the Board members were very upset over these letters to the editor. He testified that he believed Hall was wrongly subjecting the entire Board to public scorn and criticism. In response to Hall's letters, Foil wrote a memorandum to the Board members which contained the following statement:

Speaking of putting a lid on our current gadfly brings the note on the enclosed newspaper "letter to the editor." We ... cannot say that the barrage of opinions and innuendoes does not bother us. The trick is to not let her know how much a pain she is and where our pain is located! ... Maybe enough rope will allow our gadfly to suspend herself in an awkward position. Hopefully, it will be an uncomfortable one.

(J.A. at 722.) Foil testified that the "gadfly" referred to in the memorandum was Hall, and he admitted at trial that after Hall's initial letters he began to watch for her to do something "which we could address other than her writing letters." (J.A. at 69.)

After Foil's initial memorandum to the Board, Hall and her husband made an additional FOIA request for numerous items of information, including the salaries of District employees and the travel expenses of all school administrators for the previous three years. Foil wrote back with the salary information, but requested a deposit of $500 for research and copying to respond to the travel information. Thereupon, Ronald Hall wrote an editorial criticizing Foil for requesting such a large deposit, and accused Foil of "cover[ing] up" the truth. (J.A. at 661.)

Foil testified at trial that after the second FOIA request, he felt inclined to reply to the Halls. He wrote a memorandum to the Board in which he proclaimed that, because he could not remain quiet any longer, he would print an ad in the next week's paper. The ad read as follows:

**REMEMBER THIS**

IF YOU WORK FOR A MAN, in Heaven's name, WORK for him. If he pays you wages which supply you bread and butter, work for him; speak well of him; stand by him and stand by the institutions he represents. If put to a pinch, and [sic] ounce of loyalty is worth a pound of cleverness. If you must vilify, condemn and eternally disparage—resign your position, and when you are outside, damn to your heart's content, but as long as you are part of the institution do not condemn it. If you do that, you are loosening the tendrils that are holding you to that institution, and at the first high wind that comes along, you will be uprooted and blown away, and probably will never know the reason why.

Final Word from BILL FOIL. Paid for with private funds by Bill and his two friends.

(J.A. at 662.)

The Halls were extremely upset over the ad. In another letter published in the local newspaper, Ronald Hall wrote to Daniel Hurrle, the Chairman of the Board, requesting that Foil be reprimanded, that the reprimand be placed in Foil's file, and that a public apology be issued to school employees and the community. Hurrle wrote back stating that "the Board did not read the statement (Remember This) as intimidating. Further, the statement was placed in a display advertisement and paid for by a private citizen exercising his First Amendment rights in freedom of speech." (J.A. at 641.) Several days after Foil informed the Board that he was going to place the "Remember This" ad in the paper, he displayed an openly hostile attitude toward Hall at a Teachers' Council Meeting. Foil admitted in a memorandum to the Board that when he was asked at the meeting to elaborate further on a question he believed to have been raised by

Hall, he told the representative who asked the question on Hall's behalf to "tell her to go to hell." (J.A. at 642.)

At school, Foil began to oversee Hall's actions through Cynthia Legette, the principal of North Mullins Primary School, with whom Foil maintained frequent contact. At his request, Legette began to closely monitor Hall's arrivals and departures, and would then report her findings to Foil. Legette sent Hall memoranda criticizing her for such actions as taking leave and leaving a faculty meeting early. Once, Legette actually followed Hall to her gynecological appointment. Foil would then regularly report Legette's findings to the Board through memoranda.

Hall's responses to Legette only served to further increase the tension in the school. She wrote memoranda to Legette, complaining about numerous problems she had with the school system and administration, which she copied to a myriad of people, including her attorney, the State Superintendent of Education, her U.S. Congressman, and then-President Bush. Furthermore, it is clear that as a result of the tension between Legette and Hall, Hall was not popular with the faculty at North Mullins. For instance, at trial several teachers testified that they thought Hall displayed a disrespectful attitude toward Legette, and her memos to Legette were rude and unprofessional. Fellow teachers also testified that Hall was rude at faculty meetings and often read her mail or a book instead of paying attention to the meeting.

In addition to being unpopular among her fellow teachers, there was evidence of Hall's numerous absences during the school year, which she testified were due to illness exacerbated by the tremendous strain she felt. Although Legette testified that Hall's absences were disruptive to the school, she also testified that she approved all of Hall's absences and never reprimanded her for being absent too many days.

There was also evidence of many school visits to Hall from the president of Wildlife Action, a community environmental organization in which Hall was actively involved. Foil, however, admitted at trial that he approved such visits as long as they were not intrusive on classroom activities.

Despite the claims of disruptive behavior, numerous absences, and visitors, in April 1991, Hall was offered a teaching contract for the following year. The contract was offered to her without any conditions or stipulations, although Legette testified at trial that it was possible to put stipulations on these teaching contracts. Legette testified that she felt she had not received sufficient support from Foil to put a stipulation on Ms. Hall's contract.

On April 1, 1991, Dr. Barbara Nielsen, State Superintendent of Education, appointed Hall to serve on a blue ribbon task force in the State Department of Education called "Teachers As Professionals." Hall regarded the appointment as an honor and immediately began working on her duties. Legette and her fellow teachers, however, were rather surprised at her appointment. One teacher testified that she wrote Dr. Nielson to question Ms. Hall's appointment.

In performing her committee duties, Hall distributed a questionnaire soliciting examples of how teachers are treated or not treated as professionals and suggestions for improvement. Although Hall received some responses, many teachers at North Mullins failed to answer the survey or simply wrote "no complaint." Frustrated with the lack of response, Ms. Hall again wrote to the local paper. In a letter to the editor, she printed her entire questionnaire, and added the following statement:

> To those that write "no complaints," evidently they are rather myopic as teachers and are completely satisfied with their salary, class load, text book choices, etc. It must be nice to be so completely oblivious to the obvious problems surrounding our educational system that "when Johnny can't read" it just doesn't seem to bother some of our "educators." And the reason "Johnny can't read" is because a few of our teachers simply think "everyone is just fine," that reform is not needed. How tragic for our children.

(J.A. at 734.) Hall also left a note for the teachers at North Mullins, which criticized the ones who responded to her survey with "no complaints" or "no problems." Soon

thereafter, the teachers held a meeting in which they drafted a petition for the transfer of Hall. The petition read, "[a]t this point we feel that Mrs. Maggi Hall's actions are affecting the learning environment at North Mullins Primary School. With our student's [sic] best interests at heart, we request that Mrs. Hall be transferred to another school." (J.A. at 740.). The petition was signed by twenty of the twenty-five teachers employed at North Mullins.

Hall presented substantial evidence before the district court that the animosity between her and her fellow teachers was in part based upon her writings to the local newspaper. At approximately the same time the teachers drafted the petition for her transfer, Hall received an anonymous letter from "Some Concerned Marion County Educators." (J.A. at 736.) The letter began, "[i]t concerns some of us deeply that you have chosen to air your differences with the Marion County School System in the newspaper. Both you and your husband's tactics are 'tacky' as well as unprofessional." *Id.* The letter ended with the statement: "[j]ust remember, 'those who go after, sometimes get caught themselves.' Your day is coming Mrs. Hall." *Id.*

At this point, Foil and the Board hired an attorney to advise them on how to handle the situation at North Mullins. Foil admitted that, upon consulting with the attorney, he believed the evidence to support firing Hall was "thin," and that the attorney advised him to procure "hard evidence." (J.A. at 100, 646.) Foil wrote a memorandum to the Board, sarcastically entitled, "[r]eport on our most professional teacher." (J.A. at 646.) In this memorandum, Foil outlined his scheme to procure the hard evidence needed to fire Hall, to which the Board made no response or criticism. *Id.*

Foil's scheme involved an award the Chevron Corporation was giving to Wildlife Action, the environmental organization in which Hall was actively involved. Hall was invited at the expense of Chevron to travel to Washington, D.C., to accept the award. She requested three days off to attend the ceremony, which Foil refused to authorize. Foil, however, suspected that Hall would go to Washington, D.C., without his approval and

thought this would be the perfect opportunity to catch Hall in a clear act of insubordination. To obtain proof that Hall attended this ceremony, the Board allowed Foil to spend $300 of District money to hire a photographer to photograph Hall receiving the award in Washington, D.C. Foil also had Legette call the hotel to confirm that Hall had made reservations. Even before he received the photographer's pictures, Foil drafted a letter of suspension and recommendation for dismissal "on the basis of dishonest reasons having been given for leaving school...." (J.A. at 647.)

Foil was unable to send the dismissal letter, however, because the endeavor did not produce the needed evidence. When the photographer returned the picture, it was of Ms. Hall's daughter receiving the award on her behalf. Nevertheless, Foil continued his efforts to fire Hall. He wrote in a memorandum to the Board, "Bruce Davis [attorney for the Board] and I agree that the reason is a bit thin, but I am ready to take the chance even if the Board has to reinstate her and force me to apologize on my knees at high noon on the courthouse steps." (J.A. at 744.) The memo also stated, "[t]ime ... is running out on our credibility with Cindy [Legette] and the other staff members at North Mullins Primary School. I want to act even if it means saying that I am sorry!" *Id.* Three days later, Foil wrote a letter to Hall informing her that he was transferring her to the district office, where she would remain in an empty office for the conclusion of the school year. Foil also wrote a letter to Hall requesting that she submit documentation proving that she did not travel to Washington, D.C. to accept the award. Hall responded with the appropriate documentation.

Until Hall received the notice of transfer from Foil, no efforts had been made by the principal or anyone connected with the District to warn Hall that, even though her contract had just been renewed without condition, she was in danger of being terminated.

In June 1991, approximately one month after she was transferred, and six months after Foil advised the Board that he intended to put a "lid on our current gadfly" and

began detailing to the Board his efforts to ensnare her, Hall received a letter from Daniel W. Hurrle, the Chairman of the Board. The letter informed Hall that it had been brought to the attention of the Board that her uncooperative and disrespectful attitude and behavior had eroded confidence in her ability to teach, and that such behavior warranted immediate dismissal. The letter also informed Hall that she could request a hearing before the Board to show cause why she should not be dismissed. (J.A. at 651.)

Subsequently, the Board held a three-night hearing, during which all the members of the Board presided. Hall and the administration each were represented by legal counsel. The Board hired another attorney to advise it how to conduct the hearing, and a court reporter transcribed the testimony. The Board held deliberations, in which Foil did not participate, for approximately four hours. The Board then issued a letter to Hall in which it concluded that she should be dismissed as a teacher with the District. The Board's letter based its reasoning on Hall's disruptive behavior. The letter did not address Hall's claim that her letters to the editor caused her termination.[2]

Hall then filed this action pursuant to 42 U.S.C.§ 1983, claiming that the District violated her constitutional rights by terminating her employment in retaliation for her exercise of her right to free speech. As noted earlier, Hall prevailed in the district court. On appeal, the District first contends that Hall should have been collaterally estopped from litigating her First Amendment claim. Second, the District asserts that the district court erred in concluding that Hall was dismissed for exercising her First Amendment rights rather than for legitimate, non-retalia-

tory reasons. Finally, the District argues that it cannot be held vicariously liable for the actions of its employees where the retaliatory actions alleged were committed by persons who did not possess final policymaking authority. We will address the issue preclusion question first, then turn to the propriety of the district court's judgment and whether the District may be held liable.

## II.

Federal courts are required under 28 U.S.C. § 1738 (1988), to give state court judgments the same issue and claim preclusive effect in subsequent § 1983 actions as they would be entitled in the state court. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 97–98, 101 S.Ct. 411, 416–17, 66 L.Ed.2d 308 (1980). After the Board issued its opinion that there were grounds for Hall's termination, Hall had two options for review of the Board's decision. First, Hall could have appealed the Board's decision to the Court of Common Pleas in Marion County, and if she lost, she could have appealed that determination to the Supreme Court of South Carolina. S.C.Code Ann. § 59–25–480 (Law. Co-op.1990). It is clear that had Hall taken the state court route, the final decision of the Court of Common Pleas (or the South Carolina Supreme Court if an appeal were taken) would have both issue and claim preclusive effect in federal court.

The second option available to Hall, which she pursued, was to file a claim in federal court, which may be done without appealing the Board's decision in state court.

2. The body of the letter reads as follows:

The Board has heard approximately eighteen hours of testimony and received numerous and voluminous exhibits. Based on the testimony and information presented at the hearing, the Board has concluded that, while you possess an exceptionally good knowledge of your subject matter, the evidence is overwhelming that confidence in and support for you as a teacher has become so eroded as to be virtually non-existent. It is also very clear that this loss of confidence and support is the result of your outrageously uncooperative and disrespectful attitude toward supervisory authority and

teacher colleagues at North Mullins Primary School. The evidence plainly shows a professional employee who (1) repeatedly behaves in a professionally irresponsible and completely inexcusable way, rendering her unable to work together with her principal and fellow teachers in providing an appropriate educational climate; (2) constitutes a seriously disruptive presence at school; (3) lies both to her peers and superiors; (4) shows an appalling disrespect for authority; and (5) will even demeaningly mock and otherwise verbally abuse children of tender years.
(J.A. at 746.)

*See Patsy v. Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) (exhaustion of state administrative remedies is not a prerequisite for a § 1983 action). Therefore, instead of a state court decision upholding Hall's termination, we are presented with an unreviewed state administrative decision that she should be fired, and 28 U.S.C. § 1738 is inapplicable to this case. In such a circumstance, federal common-law rules of preclusion, as outlined by *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), control.

■ In *Elliott,* the Supreme Court set out the following test for determining whether a federal court should give preclusive effect to the unreviewed factual findings of a state administrative body:

[W]hen a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.

*Id.* at 799, 106 S.Ct. at 3226 (citation omitted) (quoting *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)). While *Elliott* directs us to look at South Carolina principles of preclusion, we do so only if the specific conditions discussed by the Supreme Court are met. "We give [preclusive] effect to judgments issued by an agency (1) acting in a judicial capacity, (2) resolving disputed issues of fact properly before it, (3) if the parties have had an opportunity to litigate the issues." *Reed v. AMAX Coal Co.,* 971 F.2d 1295, 1300 (7th Cir.1992). If these requirements of the *Elliott* test are not satisfied, "federal courts are not required to give preclusive effect to the state agency's factfinding," even if such findings would be given preclusive effect in the State's courts. *Layne v. Campbell County Dept. of Social Servs.,* 939 F.2d 217, 221 n. 13 (4th Cir.1991); *see also Gjellum v. City of Birmingham,* 829 F.2d 1056, 1070 n. 29 (11th Cir.1987).

Our first inquiry, therefore, is to determine whether the Board acted in a judicial capacity. In this case, the district court not-

ed that Hall was represented by counsel, she presented evidence, all testimony was taken under oath, and the proceedings were recorded by a stenographer. Although Hall's hearing before the Board clearly had the appearance of a judicial proceeding, the district court also found that the Board maintained an impermissible bias against Hall. The district court stated, "I find that Foil's disparaging comments tainted any unbiased views the board members may have had concerning the situation." (J.A. at 788.) The district court cited as evidence for this conclusion Foil's constant memoranda to the Board, "clearly indicat[ing] that Foil was the "'eyes and ears'" of the Board." *Id.* The district court also found that the Board's failure to reprimand Foil after the "Remember This" ad further evidenced its bias against Hall, and that "Foil exerted such a strong influence over the board, that effectively his decisions became the board's decisions." *Id.*

■ Acting in a judicial capacity requires that an individual in an administrative hearing be afforded an impartial tribunal. *See Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Clearly decisionmakers who maintain a bias against one of the parties litigating before them are not acting in a judicial capacity. "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Id.* (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)). In this case, the Board's involvement in Foil's vendetta to fire Hall because of her public criticisms of him and of the Board, leaves us in agreement with the district court that the Board was not a neutral and detached arbiter.

■ We do not suggest, however, that administrative bodies are biased any time they have *ex parte* knowledge of the dispute being adjudicated before them. To the contrary, state administrators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429

(1941). Furthermore, mere familiarity with the facts of a case does not render a decision-maker impermissibly biased. *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Ed. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976). Nevertheless, we hold that for the purposes of *Elliott,* when there has been a finding of actual bias on the part of the administrative body adjudicating a claim, that decisionmaker is clearly not acting in a judicial capacity. In this case, the district court made a finding that the Board was actually biased against Hall, overcoming any presumption of impartiality afforded the Board. We conclude that this finding is supported by the record.

The District, however, argues that we should preclude Hall from bringing this claim because South Carolina courts would grant preclusive effect to the Board's hearing. *See Bennett v. South Carolina Dept. of Corrections,* 305 S.C. 310, 408 S.E.2d 230, 231–32 (1991); *Perry v. State Law Enforcement Div.,* —— S.C. ——, 426 S.E.2d 334 (Ct.App. 1992). The District, in its argument, mischaracterizes the Supreme Court's holding in *Elliott.* Although it is true that we look to South Carolina rules of preclusion if the *Elliott* test is satisfied, our inquiry ends if we determine that the Board's hearing did not fulfill those requirements for preclusion. *See Layne,* 939 F.2d at 221 n. 13 ("[I]f the ... requirements of the [*Elliott*] test are not satisfied ... federal courts are not required to give preclusive effect to the state agency's factfinding."). Because we have determined that the Board's hearing did not satisfy the first requirement for preclusion articulated in *Elliott,* we need not consider whether South Carolina courts would preclude Hall from raising her claims. Thus, we conclude that the district court correctly determined that Hall was not barred from asserting her § 1983 claim in federal court.

## III.

■ The District next challenges the district court's determination that it fired Hall in retaliation for her exercise of her right to free speech. It is clear that "[a] state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." *Stroman v. Colleton County Sch. Dist.,* 981 F.2d 152, 155–56 (4th Cir.1992). As defined by the Supreme Court, our task "is to seek 'a balance between the interests of the[employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)).

■ Properly balancing these interests involves a three-pronged analysis. *See Daniels v. Quinn,* 801 F.2d 687, 689 (4th Cir. 1986). We must first determine whether Hall's speech involved an issue of public concern. *Id.* If the speech regarded an issue of public concern, we next determine whether Hall would have been dismissed "but for" her protected speech. *Stroman,* 981 F.2d at 156. Finally, we decide whether Hall's exercise of free speech is outweighed by the "countervailing interest of the state in providing the public service the teacher was hired to provide." *Id.*

■ Whether the speech fairly relates to an issue of public concern is a question of law reviewed *de novo* by this court, and is to be determined by the content, form, and context of the speech. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. The essential question is whether the employee is speaking out as a citizen, upon matters of public concern, or as an employee, upon matters only of personal interest. *Id.* at 147, 103 S.Ct. at 1690. In this case, there were several types of writings. Hall wrote internal memoranda to Legette involving personal grievances at the school, but she also wrote numerous letters that were published in the local newspaper claiming that the Board was mismanaging taxpayers' money. In addition, Hall made FOIA requests for public information such as travel expenses of school administrators and the salaries of the Board, and distributed and published a questionnaire relating to her work on a state task force titled "Teachers as Professionals."

The District argues that Hall's internal memoranda to Legette involved personal employee grievances and did not involve matters of public concern. In *Stroman*, 981 F.2d at 157–58, this court held that an internal memorandum that mentioned officials' mismanagement of the budget could arguably be a matter of public concern. Although it is true that under *Stroman*, Hall's internal memoranda may have been a private matter, it is clear that her letters to the editor, FOIA requests, and questionnaire involved a public employee speaking as a citizen upon issues of public concern. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Those public writings are clearly the focus of this lawsuit and the requirements of the first inquiry are satisfied.

Our next inquiry is whether Hall would have been fired "but for" her protected speech. This determination is a factual one, *Daniels*, 801 F.2d at 689, and therefore, is not to be reversed absent clear error. *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir.1989). This inquiry involves two steps, and the employer will not be liable if the discharge would have occurred for other reasons, such as the employee's incompetence. *See Daniels*, 801 F.2d at 689. In the first step, the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in the discharge. *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. at 576, 50 L.Ed.2d 471 (1977). If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have fired the employee even in the absence of the protected speech. *Id.*

The district court found that Hall easily met her burden of proving that her protected speech was a motivating factor in her dismissal. The court noted that Foil's initial interest in Hall arose after the publication of her first letter to the editor. In response to Hall's letters, Foil wrote memoranda to the Board about "putting a lid on our current gadfly," and noted that "[m]aybe enough rope will allow our gadfly to suspend herself in an awkward position. Hopefully, it will be an uncomfortable one." (J.A. at 722.) Foil had Legette continuously monitor Hall's actions, and his memoranda to the Board frequently included the results of Legette's observations. In addition, Foil took out the "Remember This" ad in the local paper, which he printed after Hall's additional letters to the editor. The district court found the ad menacing and unquestionably threatening to Hall when it stated, "[i]f you must vilify, condemn and eternally disparage .... you are loosening the tendrils that are holding you to that institution, and at the first high wind that comes along, you will be uprooted and blown away." The district court found that Foil's responses were the direct result of Hall's protected speech and evidenced Foil's intent to have her fired because of her criticisms of him and the Board. The district court further found that the Board's unwillingness to reprimand Foil for the "Remember This" ad, and its response to Ronald Hall that the ad was not intimidating, evidenced the tremendous influence Foil had over the Board and the Board's willingness to condone Foil's behavior.

Furthermore, the district court pointed to Foil's unsuccessful scheme to hire a photographer with public funds to take a picture of Hall accepting her award in Washington, D.C. The court determined that this tactic was a continuing part of Foil's plan, motivated by Hall's exercise of her First Amendment rights, to obtain an ostensibly legitimate reason to fire Hall. The court also noted that, because Foil continuously apprised the Board of his activities through numerous memoranda, the Board was fully aware of, and condoned his actions. Therefore, the court concluded that Hall had clearly shown that her protected speech was a motivating factor in her dismissal, both because of Foil's retaliatory conduct and his influence over the Board.

Because the district court found that Hall had satisfied her burden of production, it proceeded to the second factual question: whether the District had shown by a preponderance of the evidence that it would have terminated Hall absent her protected speech. The district court held that the District "utterly failed" in its burden, concluding that the District would not have fired Hall "but for" her protected speech. The District now challenges that determination as clearly erro-

neous. The District contends that the foremost reason Hall was fired was her disrespectful and disruptive behavior, which caused twenty of her twenty-five fellow teachers to petition for her transfer. The District also notes Hall's disrespectful attitude toward Legette through memoranda and at faculty meetings, her numerous absences, and her frequent visitors from outside the school.

Although the District persuasively argues that Hall was not beloved by her fellow teachers and that there may have been legitimate grievances against her, we do not agree that the district court's findings are clearly erroneous. The clearly erroneous standard does not entitle a reviewing court to reverse the finder of fact simply because it may have decided the case differently. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). " 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*' " *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969)). Indeed, if the district court's conclusions are plausible when viewing the evidence in its entirety, the court of appeals may not reverse even if it would have weighed the evidence differently had it been the trier of fact. *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511–12. Moreover, we must afford the district court's findings great weight in this case, because the factual determinations are largely based on witness credibility. *See Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir.1992).

Upon viewing the evidence in its entirety, we conclude that the district court's findings of fact were based on a clearly plausible view of the evidence. The district court conducted the trial and observed the evidence and the witnesses first hand, so it was in the best position to make credibility determinations. Hall presented abundant evidence of the Board's knowledge and acquiescence in Foil's retaliatory conduct, while the District presented evidence of disrespectful conduct, absences, and numerous visitors on the part of

Hall. The district court provided several grounds for disputing the District's proffered reasons for terminating Hall. First, the court noted that in April 1990, the District offered Hall a teaching contract free of any stipulations or probationary terms. Moreover, prior to Hall's transfer and dismissal, she received no reprimand or formal notification of her unacceptable behavior, and her personnel file failed to mention any disruptive or unprofessional conduct. The district court found that the District's failure to make an honest attempt to resolve the problems surrounding Hall at North Mullins was part of Foil's plan, which he outlined in his first memorandum to the Board when he expressed hope that Hall might "suspend herself in an awkward position." (J.A. at 722.) The district court found that Hall was given no notice that she was doing anything wrong because Foil had motives other than reaching a fair resolution of the problem. The court concluded that Foil and the Board wanted Hall fired because of her criticism in the letters to the local papers. (J.A. at 722–23.) The district court engaged in a principled factfinding process, and was undoubtedly within its boundaries when it determined that the reasons the District proffered for Hall's termination were merely pretextual, and that the actual reason for Hall's dismissal was her exercise of her First Amendment rights. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1104 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

Finally, in our analysis we must weigh whether Hall's right to free speech is outweighed by the "countervailing interest of the state in providing the public service the teacher was hired to provide." *Stroman*, 981 F.2d at 156. This determination is a question of law, *Daniels*, 801 F.2d at 690, to be reviewed *de novo*. *Daughtrey*, 874 F.2d at 217. As a public school teacher, Hall's ability to express publicly her opinion as to expenditures of school funds without fear of retaliatory dismissal is essential. *See Pickering*, 391 U.S. at 572, 88 S.Ct. at 1736.

The District argues that, under *Stroman*, the lower court erred in weighing this balance in favor of Hall. In *Stroman*, a public

school teacher was terminated for circulating a letter to fellow teachers in which he complained about the change in summer pay policy. The teacher also criticized the District's management of the budget and encouraged a teacher "sick-out" during examination week. *Stroman,* 981 F.2d at 154–55. We determined in *Stroman* that, although the teacher's complaints about the budget may have touched upon a matter of public concern, the main thrust of the letter involved internal employee grievances. *Id.* at 159. Furthermore, the teacher was encouraging actual disruption in the school—a "sick-out" during exam week. Thus, we concluded that the limitation on the teacher's First Amendment rights did not outweigh the District's interest in having its employees abide by the policies of the District and not engage in dishonest behavior by conducting a "sick-out." *Id.*

*Stroman,* however, does not support a finding in favor of the District in this case. First, it is clear that Hall's speech involved core First Amendment expression, while the speech in *Stroman* was primarily an employee grievance that only minimally touched upon matters of public concern. When an employee's speech substantially involves matters of public concern, as is the case here, the state must make a stronger showing of disruption in order to prevail. *See Connick,* 461 U.S. at 152, 103 S.Ct. at 1693. Although it is clear that school districts must have wide latitude to run schools and to terminate teachers whose actions hinder the education of children, Hall, unlike the teacher in *Stroman,* never encouraged any disruptive conduct by her fellow teachers or in the school.

### IV.

Finally, the District argues that the court below erred because it held the District "vicariously liable" for the violation of Hall's First Amendment rights by Foil and Legette, neither of whom possessed final policymaking authority.[3] The District analogizes this case to *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), and contends that because neither

Foil nor Legette possessed final policymaking authority, it cannot be held liable for their unconstitutional actions. We disagree.

In *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality may not be held liable under § 1983 for an injury that was inflicted exclusively by its agents or employees. The Court stated: "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

▮ Proof of the existence of a municipal policy or custom under § 1983 does not require a plaintiff to evidence numerous similar violations. Indeed, in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), the Supreme Court held that in certain circumstances, a single violation is sufficient to invoke municipal liability. The Court reasoned that to hold a municipality liable for a single violation, the decisionmaker must possess "final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. at 1299 (footnote omitted).

In *Praprotnik,* the Supreme Court further defined when a municipality can be held liable for a single constitutional violation.

First, ... municipalities may be held liable under§ 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of *state law.* Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.

*Id.* 485 U.S. at 123, 108 S.Ct. at 924 (emphasis in original) (citations omitted) (quoting

---

**3.** The District, however, does not dispute that the Board possesses final policymaking authority, nor does it question that it can be liable for the Board's actions.

*Pembaur,* 475 U.S. at 480, 482–83 & n. 12, 106 S.Ct. at 1298, 1299–1300 & n. 12).

*Praprotnik* involved a city employee who claimed that his supervisors transferred him and eventually caused his layoff in retaliation for the exercise of his constitutional rights. The Court held that the City of St. Louis could not be held liable for the allegedly unconstitutional actions because the supervisors who allegedly engaged in unconstitutional behavior did not possess final policymaking authority. *Id.* 485 U.S. at 130, 108 S.Ct. at 927–28. The Court, however, reiterated that a municipality can be held liable for the acts of their employees if such actions are ratified by the final policymakers. The Court explained:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Id.* at 127, 108 S.Ct. at 926 (emphasis in original).

The question of which District employees maintain final policymaking authority is a question of state law to which this court can apply its independent judgment. *Id.* at 124–26, 108 S.Ct. at 924–26. Under South Carolina law, the Board is the final policymaker with regard to the employment and discharge of teachers. S.C.Code Ann. § 59–19–90(2) (Law. Co-op.1990). Although the District claims that the Board acted independently of Foil in deciding to dismiss Hall, the district court found and the evidence shows otherwise. As discussed previously, the Board was fully apprised of all of Foil's retaliatory actions and condoned each of them. This is evidenced by Foil's numerous memoranda to the Board, and the Board's approval of the use of District money in an attempt to obtain a legitimate reason to fire Hall. The district court specifically found "that the [B]oard's refusal to intervene on behalf of Hall and its subsequent agreement to discharge her, despite knowledge of Foil's plans to terminate her for obviously improper reasons, constitutes [B]oard ratification of Foil's conduct." (J.A. at 789.) We agree.

This situation is easily distinguished from *Praprotnik* where there was no evidence that the final decisionmakers were even aware of their subordinates' unconstitutional actions. In this case, not only was the Board completely aware of Foil's actions, the Board was the only body that could fire Ms. Hall and it chose to do so. Therefore, by dismissing Hall the Board not only ratified Foil's unconstitutional behavior, but also participated in the violation of Hall's First Amendment rights. Since the Board is the final policymaker in this area of the District's business, we find that the District may be held liable for the act of the Board in dismissing Hall.

## V.

In summary, we affirm the district court's determination that Hall was not precluded from asserting her First Amendment claim in federal court. We also affirm the district court's determination that the Board fired Hall in violation of her First Amendment rights and that the District may be held liable for the violations.

*AFFIRMED.*