**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-1782**

_____

MARTIN MISJUNS,

       Plaintiff – Appellant,

    v.

CITY OF LYNCHBURG,

       Defendant – Appellee,

  and

LYNCHBURG FIRE DEPARTMENT; MARY JANE TOUSIGNANT DOLAN, in her official capacity; BEAU WRIGHT, in his official capacity; REID WODICKA, in his official capacity,

       Defendants.

_____

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg.  Robert S. Ballou, District Judge.  (6:21-cv-00025-RSB-CKM)

_____

Argued:  March 20, 2025                           Decided:  June 5, 2025

_____

Before WILKINSON, GREGORY, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by published opinion.  Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Quattlebaum joined.  Judge Wilkinson wrote a concurring opinion.

_____

**ARGUED:** Richard D. Boyer, INTEGRITY LAW FIRM, PLLC, Lynchburg, Virginia; James Fairchild, FAIRCHILD & YODER, PLLC, Forest, Virginia, for Appellant. Jennifer Royer, ROYER LAW FIRM, P.C., Roanoke, Virginia, for Appellee.

---

GREGORY, Circuit Judge:

This case concerns the firing of a Lynchburg Fire Department employee following offensive social media posts attacking transgender individuals. After public outcry and an internal investigation, the City of Lynchburg terminated Martin Misjuns from his position as Fire Captain. Misjuns then brought suit against the City, alleging a mix of constitutional, statutory, and common law claims. The district court dismissed all of Misjuns' claims. On review, we affirm the district court's dismissal.

I.

Martin Misjuns was employed as a Fire Captain and paramedic by the City of Lynchburg as part of the Lynchburg Fire Department ("LFD"). J.A. 3, 75. He was also a union representative with IAFF Local 1146, the Lynchburg division of the International Association of Fire Fighters labor union, and Ward I Chair for the Lynchburg Republican City Committee. J.A. 3, 9.

Before the events that serve as the basis of this suit, there were already deep-seated tensions between Misjuns and the City. For example, Misjuns alleged that LFD engaged in "discriminatory training and promotion practices" against him in 2019 and 2020. J.A. 5. He also alleged politically-motivated actions. In spring 2020, IAFF Local 1146 and Misjuns supported Republican candidates for Lynchburg City Council who ran against candidates supported by the Democratic majority on City Council, including Defendants Mayor Mary Dolan and Vice-Mayor Beau Wright. J.A. 3, 8–9. One of the Deputy Fire Chiefs allegedly "began a pattern of harassing behavior" against Misjuns, including

3

sending him a text message that he did not approve of Local 1146's post supporting the Republican candidates.  J.A. 9.

While this is important context, our case centers on Misjuns' Facebook posts. Misjuns maintained two Facebook pages:  one, a personal page identifying him as "Marty Misjuns"; the other, a public figure page, identifying him as "Martin J. Misjuns, Ward I Chair - Lynchburg Republican City Committee."  J.A. 11.  Neither page identified him as a Fire Captain or a city employee.  *Id.*  Misjuns claimed that as a result of certain Facebook posts, Mayor Dolan, Vice-Mayor Wright, and Defendant City Manager Reid Wodicka, J.A. 5, conspired with Gregory Wormser, the LFD's Fire Chief and senior officer, J.A. 4, "to deny [Misjuns] his constitutional rights to express his deeply held religious beliefs and political views on matters of public concern."  J.A. 13–14.

### A.

On January 26, 2021, Misjuns posted four cartoons on his public figure Facebook page with the caption "#BidenErasedWomen – Coming to your daughters [sic] high school locker room in the near future."  J.A. 11–12.  The cartoons depicted offensive stereotypes of transgender women in bathrooms and participating in sports.  J.A. 11–12, 42–45.

The City explained that "citizens saw these posts, quickly identified Misjuns as a Paramedic and Fire Captain for the City and made numerous complaints to the City."  Resp. Br. at 1.

Most of these citizen complaints came from individuals affiliated with the LGBTQ+ group "Hill City Pride" and referred to Misjuns as "vile," "hateful," "bigoted," "dehumanizing," "hostile," and "dangerous" for posting the cartoons.  J.A. 13.

4

In response to the transphobic cartoons that Misjuns shared, Dolan sent an email to Wodicka on January 29, 2021, stating, "This needs to be addressed!  We need to have zero tolerance for this type of activity on the part of City employees.  I know that this is not the first time this person has displayed questionable if not unconscionable rhetorical post [sic] on his social media platforms . . . . Please let's talk about a meeting to discuss."  J.A. 14.

The City began responding to some of the citizen complaints.  On February 3, 2021, Wodicka sent an email reply to a citizen complainant named Jennifer Staton.  Wodicka wrote, "I have viewed the information that was posted online and I agree with you that this is not the sort of culture that the City intends to create or support . . . . Please understand that this is a personnel matter that will be addressed appropriately . . . ."  J.A. 14.  Dolan emailed another citizen complainant, Michael Kittinger, also addressing Misjuns' post, stating, "I was speechless when I saw what Mr. Misjuns posted.  I am totally in agreement with you and do not support or will not tolerate this type of malicious rhetoric.  No question his comments are unconscionable, and City Leadership needs to take action."  J.A. 15.

On February 4, 2021, Wodicka emailed Dolan with Wright copied, stating, "Beau [Wright] and I just spent some time talking this over.  Maybe you and I can talk about it a little more tomorrow."  J.A. 15.

Misjuns became aware of the citizen complaints.  On February 1, 2021, he posted a meme to his public figure Facebook page with the caption, "Let's set something straight for the attacks I've been taking from a local activist group . . ."  J.A. 11.  The meme stated: "In the beginning, God created Adam & Eve.  Adam could never be a Madam.  Eve could

5

never become Steve. Anyone who tells you otherwise defies the one true God. Threatening anyone for believing & saying this is most likely a hate crime." J.A. 11, 41.

On March 15, 2021, Misjuns created and circulated a petition on Facebook "asking readers to email the Mayor, City Council and the City Manager requesting that the Mayor honor her oath of office to protect and defend the Constitution, by protecting [his] First Amendment rights of political speech." J.A. 16.

## B.

On March 25, 2021, Misjuns received a letter from Fire Chief Wormser, which he alleged Wormser sent "in response to instructions from one or more of Dolan, Wright, and Wodicka." J.A. 3–4, 12. The letter ordered Misjuns to attend an "interrogation" on March 29 to discuss several citizen complaints regarding the cartoons and meme. J.A. 12. Wormser also informed Misjuns that he was under investigation for social media statements making political criticisms of Dolan. J.A. 13. The record shows that Wormser provided Misjuns with a notice of the complaints made against him. J.A. 46. On March 29, 2021, the initial "interrogation" occurred. J.A. 16.

Per Misjuns' account, Deputy Fire Chief Robert Lipscomb then began collecting allegedly false reports accusing Misjuns of creating a hostile work environment. J.A. 4, 16. On May 10, 2021, Wormser notified Misjuns of his decision to suspend Misjuns. J.A. 16. On June 27, Lipscomb ordered Misjuns to attend a second "interrogation," which occurred on August 2. *Id.* On October 18, 2021, Wormser notified Misjuns via letter that he was terminated from employment. J.A. 17.

6

Misjuns alleged that his treatment by the City, culminating in termination, was "in stark contrast" to Dolan, Wodicka, and Wright's treatment of Wormser, who attended and supported a protest put on by Black Lives Matter in July 2020. J.A. 15. Wormser attended and participated in the protest in LFD uniform and did not face any adverse employment action. J.A. 15–16.

Misjuns appealed his firing in accordance with the City's grievance procedures, including appealing to the City's Employee Appeal Board. J.A. 17. In March 2022, the Board upheld his firing. *Id.* In August 2022, one of the members of the Board told him that the only reason his termination was upheld was because he "spoke up against the Mayor" by creating the Facebook petition. *Id.*

### C.

Misjuns initially filed suit in the Circuit Court for the City of Lynchburg, Virginia on March 31, 2021, two days after his initial "interrogation." J.A. 16. The City removed the case to federal court in April 2021. *Id.*; *see also* Resp. Br. at 6. Misjuns later amended his complaint.

In the operative Amended Complaint, Misjuns brought the following claims: breach of contract claim against the City (Count One); First Amendment free speech claim under 42 U.S.C. § 1983 against all Defendants (Count Two); First Amendment free exercise of religion claim under 42 U.S.C. § 1983 against all Defendants (Count Three); Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 against all Defendants (Count Four); conspiracy claim under 42 U.S.C. § 1985 against Dolan, Wright, and Wodicka—the Individual Defendants—in their official capacities (Count Five); and wrongful termination

7

claim against Dolan, Wright, and Wodicka in their official capacities (Count Six). J.A. 19–33. Misjuns attached fourteen exhibits to his Complaint, including copies of his social media posts, emails sent by City officials, and letters regarding his termination. *See* J.A. 36–63. Defendants filed a motion to dismiss all counts under Federal Rule of Civil Procedure 12(b)(6). *See* J.A. 70.

The district court explained that since briefing the motion, the parties "agreed that the claim against each Individual Defendant in his or her official capacity 'should be dismissed as duplicative.'" J.A. 130 (quoting *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004)). The court continued that "[a]s all claims brought against the Individual Defendants were brought against them in their official capacities only, all claims against them will thus be dismissed." *Id.*

The district court then granted Defendants' motion to dismiss as to Count One (breach of contract), Count Four (equal protection violation), Count Five (§ 1985 conspiracy), and Count Six (wrongful termination). J.A. 144. The court also granted the motion to dismiss Counts Two and Three (both First Amendment violations) in part and denied it in part, *id.*, which was amended by a subsequent order dismissing Misjuns' claims in their entirety, J.A. 156. Misjuns appealed both orders.

## II.

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). We review a district court's dismissal under Rule 12(b)(6) de novo and view the complaint in

8

the light most favorable to the plaintiff, accepting as true all well-pleaded allegations. *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002); *see also* Fed. R. Civ. P. 8(a)(2) (a claim must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). We need not, however, accept the legal conclusions drawn from the facts, *see Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 2000), nor "unwarranted inferences, unreasonable conclusions, or arguments," *see E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citation omitted).

A court may only consider exhibits at the motion to dismiss stage when they are "integral to and explicitly relied on in the complaint" and authenticity is not disputed. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In this case, the district court determined that the exhibits Misjuns attached to his Amended Complaint were "integral" and thus considered them. J.A. 131. This ruling was not challenged on appeal, so we will likewise treat those exhibits as integrated.

## III.

We first turn to Misjuns' three 42 U.S.C. § 1983 claims against the City: two First Amendment claims (Counts Two and Three) and one Fourteenth Amendment claim (Count Four).

To hold a municipality liable for a constitutional violation under § 1983, a plaintiff must show that the execution of a policy or custom of the municipality caused the violation. *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 195 (4th Cir. 1994). This is referred to as *Monell* liability. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694

9

(1978). "A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up). Misjuns contends that he has pleaded facts sufficient to show *Monell* liability under (2), a decision of a person with final policymaking authority, and (4), a persistent and widespread practice. Opening Br. at 27. We find that he has not adequately pleaded either.

## A.

As for a decision of a person with final policymaking authority, Misjuns argues that he "has plainly pleaded that Wormser had authority as Fire Chief to fire him and did so." Opening Br. at 27; *see also* Reply Br. at 6–7. However, having the authority to make personnel decisions, such as the decision to terminate Misjuns' employment, does not necessarily make Wormser "a person with final policymaking authority." Caselaw is clear that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986). "[T]here is a marked difference between 'the authority to make final policy [and] the authority to make final implementing decisions.'" *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 555 (4th Cir. 2018) (quoting *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995)). For example, and as is

10

analogous here, the Supreme Court has explained that a "County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy." *Pembaur*, 475 U.S. at 483 n.12. In another case, this Court found that "although a county police chief was authorized to make a final personnel decision, he did not have 'final policymaking authority' that would impute liability . . . to the county." *Greensboro Prof'l Fire Fighters Ass'n, Local 3157*, 64 F.3d at 965 (discussing *Crowley v. Prince George's Cty.*, 890 F.2d 683 (4th Cir. 1989)); *see also id.* at 966 (holding that the Fire Chief did not have final policymaking authority). Accordingly, the fact that Wormser had the authority to fire Misjuns, which was pursuant to the City's Employment Policies and Procedures Manual, *see* J.A. 56, does not mean that he had final policymaking authority.

Misjuns never alleged any facts to plausibly support that Wormser had final policymaking authority. In fact, his Complaint demonstrates the opposite, stating that Dolan, Wright, and Wodicka were "charged with handling personnel matters and enforcing the laws and policies of the City." J.A. 5. He also alleged that Wormser took actions "in response to instructions from one or more of Dolan, Wright and Wodicka." J.A. 12; *see also* J.A. 15 (stating that they "directed Wormser to initiate an 'interrogation'"). If an official's acts are subject to review or supervision by a municipal policymaker, as appears to be the case here, that official does not have final policymaking authority. *See Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523–24 (4th Cir. 2000). Furthermore, merely stating the legal conclusion that Wormser had final policymaking authority does not make it so. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

11

The fact that Wormser had the authority to fire Misjuns does not equate to final policymaking authority sufficient to plead *Monell* liability.

B.

Next, Misjuns argues that he "has pleaded facts sufficient to show a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" Opening Br. at 27. Under this theory of municipal liability, unconstitutional practices can "become sufficiently widespread . . . [that] they may assume the quality of 'custom or usage' which, per § 1983, has the force of state 'law' for purposes of invoking the remedies provided by § 1983." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Id.* at 1387; *see also Milligan v. City of Newport News*, 743 F.2d 229, 229–30 (4th Cir. 1984) ("a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations . . . ").

In his Opening Brief, Misjuns points to the numerous emails between City officials and Hill City Pride activists as establishing a widespread practice. *See* Opening Br. at 27–28. For example, he says that "Wodicka's comments" to Staton that "this is not the sort of culture that the City intends to create or support" "clearly evince a City 'policy or custom,'" and argues the same for Dolan's emails to Kittinger. *Id.* But Misjuns does not identify *what* policy or custom these emails express. They certainly do not show a policy or custom of terminating employees with whose speech the City disagrees, for example. The only

12

facts that Misjuns alleged are regarding his own termination, and a "custom cannot be established 'by proof alone of the single violation charged.'" *Greensboro Prof'l Fire Fighters Ass'n, Local 3157*, 64 F.3d at 966 (quoting *Spell*, 824 F.2d at 1388). Rather, there must be "numerous particular instances" of unconstitutional conduct to establish a custom or practice. *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991). Misjuns has alleged none other than his own experience.[*]

Therefore, Misjuns has failed to plead *Monell* liability through allegations of a persistent and widespread practice.

*      *      *

At oral argument, Misjuns' attorney acknowledged that "*Monell* is the linchpin of [his] case [against the City]." Oral Argument at 30:57; *see also id.* at 33:34 (City of Lynchburg attorney agreeing that "without *Monell*, there is no case"). Because we find that Misjuns has failed to adequately plead *Monell* liability to enable him to sue the City

---

[*] For the first time in his Reply Brief, Misjuns contends that he has "alleged that the City had an ongoing pattern of discriminating in his promotional practices" based on "the political and religious content of his statements." Reply Br. at 1, 6; *see also id.* at 4. "A party waives an argument by failing to present it in its opening brief or by failing to 'develop [its] argument'—even if [its] brief takes a passing shot at the issue.'" *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)). Accordingly, because Misjuns failed to present this argument in his Opening Brief, *see* Opening Br. at 26–28, we find that it is waived. Even if we were to consider this new argument, it would be insufficient to establish *Monell* liability. *Cf. Carter v. Morris*, 164 F.3d 215, 218, 220 (4th Cir. 1999) (explaining that the plaintiff "has shown no relevant incident prior to her own case of which the City could have had knowledge and in which it acquiesced" and finding no "widespread and permanent" practice necessary to establish a municipal custom; explaining that "a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations.").

for constitutional violations, we affirm the district court's dismissal of his First and Fourteenth Amendment claims.

IV.

Misjuns also brought a breach of contract claim against the City of Lynchburg (Count One). J.A. 19–22. He alleged that the City's "'Employment Policies & Procedures' handbook constitutes a binding contract between Plaintiff as employee, and Defendants as employers." J.A. 19. We find that the handbook does not constitute a contract—and, without a contract, there can be no breach of contract. So, this claim must fail.

Virginia follows the doctrine of employment at-will. *Conrad v. Ellison-Harvey Co.*, 91 S.E. 763, 766 (Va. 1917). "Employee handbooks can, in certain circumstances, confer contractual rights" and alter what would otherwise be at-will employment. *Michael v. Sentara Health Sys.*, 939 F. Supp. 1220, 1236 (E.D. Va. 1996). But where a handbook includes specific disclaimers that present "a clear[] expression of intent to create at-will employment," it does not confer those contractual rights. *Id.* (quoting *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 918 (Va. 1987)). Here, Chapter 1, Article V of the handbook states that

> Virginia is an 'employment at will' state and employees of the City of Lynchburg do not have a contract of employment. Neither these policies nor any other document constitutes an express or implied employment contract or any right to continued employment. These policies do not imply or create a vesting or a contract entitling City employees to any specific benefits or policies from the City.

J.A. 142. The handbook expressly mentions at-will employment, and also expressly states that it is not a contract. We would be hard-pressed to find something clearer.

14

Misjuns contends that other language in the handbook—for example, that the City will make all employment decisions "without unlawful discrimination," J.A. 20, and treat similarly situated individuals comparably, J.A. 21—alters the nature of at-will employment and makes the handbook a contract, Opening Br. at 29–30. But "[a] general statement of policy to abide by federal law . . . cannot reasonably be construed as a deviation from at-will employment." *Nicol v. Imagematrix, Inc.*, 767 F. Supp. 744, 755 (E.D. Va. 1991).

We affirm the district court's dismissal of Misjuns' breach of contract claim, as Misjuns has failed to adequately plead the existence of a contract.

## V.

Next, Misjuns brought a claim for conspiracy to deprive him of his civil rights under 42 U.S.C. § 1985 against Defendants Dolan, Wright, and Wodicka (Count Five). J.A. 29. Because this claim was only brought against the Individual Defendants, and those claims have been dismissed by the parties' agreement, *see* J.A. 130, we find that Misjuns' conspiracy claim fails.

## VI.

Finally, Misjuns brought a claim of wrongful termination against Dolan, Wright, and Wodicka (Count Six). J.A. 32–33. Again, Misjuns did not assert this claim against the City; it was pled only against Dolan, Wright, and Wodicka. Since the claims against the Individual Defendants have been dismissed, we find that this claim fails.

15

VII.

We find that Misjuns failed to sufficiently plead facts to state a claim of relief for each of his six claims. Accordingly, and for the foregoing reasons, the district court's dismissal of Misjuns' claims is

*AFFIRMED*.

WILKINSON, Circuit Judge, concurring:

I am pleased to concur in Judge Gregory's fine opinion in this case. The record amply demonstrates that the City of Lynchburg and its officials have done nothing wrong here. That basic fact dooms the plaintiff's claims.

Misjuns repeatedly and publicly disparaged different demographic groups within his community. As the majority well illustrates, he denigrated transgender individuals, including by suggesting that they were sexual predators. J.A. 64. But he did not stop there. He demeaned black citizens by calling Black Lives Matter supporters "lazy and stupid" and "opportunistic thugs"; he played into anti-Asian and Asian American tropes by calling COVID-19 the "CCP [Chinese Communist Party] Virus"; and he has vilified Lynchburg's LGBTQ+ community as "fanatical activists that want to impose radical views on [the] community." J.A. 64, 66. This sampling was but part of a pattern that rippled through the community on a regular basis.

The plaintiff has every right to express his views, hateful though they be. But he has no right to impair the Fire Department's work and efficiency. His transparently bigoted remarks gave rise to a reasonable apprehension on the part of Lynchburg's citizens that the Fire Department's emergency-response tasks would not be carried out in an even-handed and unbiased way.

The city, in turn, was fully justified in responding to the possible corruption of its basic services and to the negative effects on recruitment that the well-known views of a well-known Captain in the Fire Department would likely have. There was nothing pretextual in the City's invocation of the principles of good governance here, and the

17

Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968) and its numerous progeny has granted municipalities, in a case such as this, the right to act precisely as the City did.