**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1753

CHANDRA BALDERSON, on behalf of herself and a class of others similarly situated,

Plaintiff - Appellee,

v.

LINCARE INC.,

Defendant - Appellant.

No. 21-1765

CHANDRA BALDERSON, on behalf of herself and a class of others similarly situated,

Plaintiff - Appellant,

v.

LINCARE INC.,

Defendant - Appellee.

Appeals from the United States District Court for the Southern District of West Virginia, at Charleston.  Thomas E. Johnston, Chief District Judge.  (2:19-cv-00666)

Argued:  October 27, 2022                    Decided:  March 15, 2023

Before NIEMEYER and RICHARDSON, Circuit Judges, and Michael S. NACHMANOFF, United States District Judge for the Eastern District of Virginia, sitting by designation.

———————————

Reversed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Richardson and Judge Nachmanoff joined.

———————————

**ARGUED:** David B. Goroff, FOLEY & LARDNER, LLP, Chicago, Illinois, for Appellant/Cross-Appellee. Andrew Carver Robey, HISSAM FORMAN DONOVAN RITCHIE PLLC, Charleston, West Virginia, for Appellee/Cross-Appellant. **ON BRIEF:** Andrew Gresik, Chicago, Illinois, Lawrence Kraus, FOLEY & LARDNER LLP, Boston, Massachusetts, for Appellant/Cross-Appellee. J. Zak Ritchie, Ryan McCune Donovan, HISSAM FORMAN DONOVAN RITCHIE PLLC, Charleston, West Virginia, for Appellee/Cross-Appellant.

———————————

NIEMEYER, Circuit Judge:

Lincare, Inc., a supplier of respiratory-therapy products and services, terminated the employment of one of its most productive sales representatives, Chandra Balderson, concluding that she had violated Lincare's "Corporate Health Care Law Compliance Program" and "Code of Conduct." While Balderson does not dispute her conduct, she contends that Lincare discriminated against her on the basis of sex because it gave a fellow male employee, who had engaged in similar conduct, only a "final written warning." Based on this, she commenced this action against Lincare, alleging that it violated the West Virginia Human Rights Act, W. Va. Code § 5-11-9, which is enforced with the jurisprudence developed under Title VII of the federal Civil Rights Act of 1964.

Following a bench trial, the district court found Lincare liable to Balderson and awarded her $30,141 in compensatory damages and $120,000 in punitive damages. In its opinion, the court concluded that the male employee was indeed an appropriate comparator and that Lincare's proffered explanation for its decision to terminate Balderson's employment was not credible. And to find Lincare liable on the ultimate issue of discriminatory intent, the court reasoned that because "the only difference" between the comparator's situation and Balderson's was that "[the comparator] is male and that Ms. Balderson is female," it followed that "the disparate treatment between [them] was a result of discriminatory animus." The court pointed to no other evidence to support a finding of discriminatory animus based on sex.

On appeal, Lincare contends that there was no evidence of discrimination on the basis of sex and that therefore the district court's finding that it violated the Human Rights

3

Act was clearly erroneous as a matter of fact and erroneous as a matter of law. Balderson cross-appealed, contending that the district court erred in determining her compensatory damages award.

While the district court's findings are entitled to substantial deference, in this case the core evidence showed that Balderson was fired by a woman and replaced by a woman and that, during the entire process, there was no indication that gender was even remotely a factor in Lincare's decision. Balderson herself acknowledged in her trial testimony that during her employment with Lincare, "[n]o one ever made any gender-related comments directed at [her]" and that during the entire termination process, there was nothing "about [Lincare's] conduct that led [her] to believe that they were treating [her] differently because of [her] gender." The only explanation Balderson offered to substantiate the claim that Lincare had discriminated against her on the basis of sex was her "belie[f]" that she and her comparator "were doing the same thing" and the fact that "he's a man; [she's] a woman." And the district court relied on this reasoning.

On this record, while we conclude that Balderson made a persuasive case that firing her was probably an unfair business decision, she nonetheless failed to present evidence sufficient for a factfinder to conclude that it was the product of discrimination based on sex. Accordingly, we reverse. And because of this conclusion, we find Balderson's cross-appeal moot.

I

Lincare is a Florida corporation based in Clearwater, Florida, which does business through facilities across the country, including, as relevant here, a facility in Parkersburg, West Virginia. The company is a supplier of respiratory-therapy products and services, selling, among other things, non-invasive mechanical ventilators to in-home patients on their physicians' orders. In providing ventilators, Lincare's sales representatives work with physicians by, among other things, providing them with guidance as to the information necessary for their patients to obtain coverage for the devices from their insurance companies or from federal programs such as Medicare.

Lincare required all employees to be familiar with and to act in compliance with its Corporate Health Care Law Compliance Program and Code of Conduct, which include specific requirements for ethical employee conduct. The Code of Conduct states that it was "designed to aid all Company employees . . . in complying with the increasingly complex Health Care Laws" — including the rules and regulations pertaining to Medicare, Medicaid, and other government-funded health care programs — "by referencing specific written policies and procedures," compliance with which is "mandatory for Company employees." To serve this purpose, the Code provides a number of examples of prohibited conduct, including "[m]isrepresenting a diagnosis for the patient to justify the services or equipment furnished" and "[o]ffering or giving valuable property, equipment, services, gifts or other benefits to a person in exchange for the referral of patients to the Company." Lincare's compliance program was overseen by Jennifer Pedersen, who had been Lincare's Chief Compliance Officer since 2000. She oversaw a department with 46 employees, and

5

she and her team conducted approximately 100 compliance investigations each year, "investigat[ing] anything that's reported to [them] that is an actual or perceived violation of the healthcare [compliance] program."

In November 2015, Chandra Balderson began working as the sales representative for Lincare in the Parkersburg market area. Prior to her employment with Lincare, she had worked as a respiratory therapist, and she was licensed as a respiratory care therapist in West Virginia and Ohio. At Lincare, she became a top-10 performer out of Lincare's approximately 1,800 sales representatives. Consistent with that success, her compensation was "heavily weighted towards commission[s]" — in 2018, for example, she earned over $80,000 for the year in commissions, in addition to her base salary of around $25,000. As the sales representative for the Parkersburg area, Balderson reported to Chad Brady, the manager of the Parkersburg center, and she worked closely with him. Her responsibilities included, as relevant here, reviewing sales orders for accuracy and completeness. As she testified, she would "look at the progress notes to make sure that [the] piece of equipment [being ordered] would be covered [by insurance] based on what the physician had documented in their progress note" before submitting the order for approval. If the progress note did not "contain all the information that would be needed for approval by Lincare," Balderson was trained to "educate the physician on what was missing and what was needed to get [the] order completed." When Balderson was out of the office, Brady sometimes filled in and performed this review process, although that task was not part of his normal duties. Brady did not have sales responsibility and, accordingly, did not earn commissions.

6

In furtherance of its corporate compliance program, Lincare conducted a voluntary internal audit of the Parkersburg center in May 2019. That audit revealed, among other things, that the files for 19 patients for whom ventilators had been ordered contained a handwritten progress note, signed and dated by a physician, with a nearly identical statement of why the ventilator was medically necessary. Specifically, while the top portion of each progress note had a different patient's name and identifying information, the body of each note appeared to be "cloned" or a "template," stating exactly or nearly exactly:

> Patient is diagnosed with chronic respiratory failure consequent to COPD. BIPAP was tried and failed. The ventilator is required to decrease work of breathing, improve pulmonary status and interruption of respiratory support could lead to serious harm, decline in health status, worsening of condition, increase risk of increasing $CO_2$ retention, untimely readmissions, or death.

The results of this audit were reported to Pedersen, who, as Lincare's Chief Compliance Officer, undertook an investigation to discover the source of the "handwritten cloned notes found in patient records that had been submitted to Lincare" for the purchase of ventilators. One patient's file, in particular, led to the answer. It showed that after receiving a ventilator order from the physician for that patient, Balderson concluded that the order did not have the required documentation needed for approval. In response, she sent a fax to the physician's office on May 2, 2019, with a cover sheet that stated:

> – I need face to face notes within the last 6 months that mention [the patient's] COPD [diagnosis] and chronic respiratory failure [diagnosis]
>
> – I need the attached statement added or the progress note signed, dated, and timed with patient's name and [date of birth] added also

7

– The Trilogy [ventilator] order was missing a few things. I added. Just need [the doctor] to sign [and] date.

Attached to that fax was (1) an unsigned, handwritten progress note on which the patient-information section was blank, and (2) a typewritten statement with a caption stating, "Sample documentation for Trilogy/Astral." Both of these documents contained essentially the same boilerplate language as the other progress notes identified by the audit. The patient's file showed that later on that same day — May 2, 2019 — the physician signed and dated the handwritten template progress note that Balderson had sent and added the patient's identifying information. The physician also signed the revised order form and had these documents, as well as records from the patient's recent office visits, faxed back to Balderson. Moreover, while the diagnostic codes that the physician included on the original order form were codes for COPD and chronic respiratory failure, the patient's office-visit records did not clearly reflect those diagnoses. Instead, they indicated a "[p]rimary diagnosis" of "[r]estrictive ventilatory defect," as well as a diagnosis for obstructive sleep apnea. On reviewing these documents, Pedersen concluded that the template progress note that the doctor had signed at Balderson's suggestion was not supported by, and indeed was "contradict[ed]" by, the patient's medical records. Pedersen therefore concluded that Balderson had "violated the [company's compliance] program by sending these documents to the physician."

Continuing the investigation, Pederson — together with Sandra Moreau, Lincare's Healthcare Services Manager, and Sheila Kalteux, Lincare's Senior Corporation Counsel — traveled from Florida to the Parkersburg center on June 3, 2019. There, they met with

8

Balderson and Brady, as well as other local Lincare employees. When Balderson met with the three senior Lincare officials, she acknowledged using the handwritten template progress notes to make it easier for the physicians she worked with to order ventilators for their patients, and she provided Pedersen with 17 such notes that had been in her sales binder. Each note had a header for one of two physician offices with which Balderson worked. The patient-information section on each of these forms was blank, but each contained the same generic statement of medical necessity that was included in the 19 completed notes uncovered earlier during the audit. Balderson later acknowledged that she had "instructed each physician to include" the language "so that their [ventilator] orders would get approved."

During the course of the Parkersburg investigation, Pedersen also learned that Brady had provided "coaching" or "leading" information to physicians by sending physicians a document entitled "Good Chart Notes Examples." That document provided three examples of statements sufficient to support a ventilator order:

> Patient evaluated for COPD. Cough has been getting worse over the past 5 years. Patient has established diagnosis of COPD & Chronic Respiratory Failure. Patient requires home ventilator 24/7 to sustain life.

> Patient presents with a history of COPD. This has been a problem for some time. It is associated with dyspnea on exertion. Nothing seems to improve his/her cough. His/her medication history is remarkable for COPD & Chronic Respiratory Failure. Patient requires home ventilator therapy to sustain life.

> Patient has a long-standing history of COPD resulting in Chronic Respiratory Failure. He/She has chronic elevations of his/her CO2 levels. CPAP/BIPAP has been tried but does not lower the CO2 levels in his/her blood. Because of his/her condition, I feel that home ventilator therapy is required for his/her condition to sustain life.

9

Pederson further learned that some physicians had used the language suggested by Brady in substantially similar form. Finally, she learned that Brady had provided "free equipment" to a patient because he failed to "follow the standard protocol for replacing equipment [lost in a fire] so that it could be billed to the patient's payor."

At the end of the June 3 investigatory visit, Pedersen made the decision to terminate Balderson's employment for violating Lincare's corporate compliance program based on her use of the template progress notes. At a meeting with Balderson, Brady, Moreau, and Kalteux, Pederson informed Balderson that her employment was being terminated for "leading" physicians. Pederson later testified that use of such template notes had "always resulted in termination" in the past. Indeed, she said specifically that she had "discharged a male [employee] . . . pretty close . . . in time to when Ms. Balderson was discharged" based on his use of template notes. Pederson also explained why the conduct represented such a serious infraction, testifying that because "Medicare administrative contractors really caution physicians . . . about not having these templates, [particularly] if the documentation is only there to support reimbursement," the use of the template progress notes can "put a physician's practice at risk" and can also result in "contradictory information" being introduced into a patient's medical record.

By contrast, Pedersen decided not to terminate Brady's employment. Instead, she gave him a "final written warning," which stated, "This final written warning is being issued to you because you violated Lincare's policies as they pertain to the Healthcare laws and regulations. You wrote information on a fax to a physician that could be considered coaching or leading information. It was also determined that you provided free

10

equipment." In explaining why she punished Balderson and Brady differently, Pederson stated that she determined that Brady's violation "did not rise to the magnitude" of Balderson's. As she explained:

> The difference between the example notes and the cloned progress notes is that the cloned notes were . . . used for a physician to add to a . . . specific patient's record. The [good] chart note examples provide information to a physician about the type of information that should be included in a progress note if most payers are going to reimburse for that service. . . . [T]hese chart note examples are just information to provide to the physician of things that could be included if applicable to that patient. That's not to say that this was right. We have educational brochures that could have been used instead of this.

After terminating Balderson's employment, Lincare hired a woman to serve as the new sales representative for the Parkersburg market area.

Balderson commenced this action against Lincare in West Virginia state court in August 2019, on her own behalf and on behalf of others similarly situated, alleging that Lincare had violated the West Virginia Patient Safety Act and the West Virginia Wage Payment and Collection Act. After Lincare removed the action to federal court on the basis of diversity jurisdiction, Balderson added a claim under the West Virginia Human Rights Act for discrimination on the basis of sex and dropped her class allegations.

The district court granted Lincare's motion for summary judgment on all claims except for the discrimination claim, and with respect to that claim, it conducted a bench trial in October 2020. By a memorandum opinion dated June 7, 2021, the court granted judgment to Balderson and awarded her $30,141 in compensatory damages and $120,000 in punitive damages, as well as attorneys fees and costs.

11

In conducting its analysis under the West Virginia Human Rights Act, the court employed the burden-shifting analysis used in federal Title VII cases, as required by West Virginia law. *See, e.g.*, *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 159–60 (W. Va. 1995). The district court held that Balderson had established a prima facie case, finding (1) that, as a female, she was a member of a protected group; (2) that she was discharged from her employment; and (3) that a male employee — Brady — was disciplined less severely than her, even though "both engaged in similar conduct." The court recognized that Balderson had to support the inference of discrimination by showing that Brady was similarly situated to her in all relevant respects, and it found that Brady was indeed "an appropriate comparator," as "[t]heir relevant conduct [was] nearly indistinguishable." It observed that "Lincare's attempt to distinguish the two by characterizing Mr. Brady's conduct as providing [only] 'examples' [was] merely semantics." The court thus concluded that Balderson had "proved her *prima facie* case of gender discrimination based on disparate treatment."

Next, the court found that even though Lincare had "articulated a legitimate, non-discriminatory reason for Ms. Balderson's discharge from employment" — namely, that she violated the company's compliance program — that reason was pretextual because "Lincare's explanation [was] simply not credible." To reach that conclusion, the court gave three reasons. First, it observed that Lincare had "shifted its justification" for firing Balderson over the course of the litigation, stating first that it had fired Balderson because she was "leading" physicians and then stating later that it fired her for "[m]isrepresenting a diagnosis or falsifying documents" based on the fax cover sheet she had sent to a

12

physician's office.  Second, the court found that Lincare's argument that Balderson's conduct "*could* have violated or actually did violate various healthcare laws" was belied by the fact that Lincare had failed to report her conduct to the U.S. Department of Health and Human Services, as it was required to do under a Corporate Integrity Agreement with the agency.  Finally, and most "critical" according to the court, it found that pretext was demonstrated by the difference in Lincare's discipline of Brady and Balderson, despite the fact that Brady's conduct was "at least comparable."

Having concluded that Balderson had established a prima facie case and that Lincare's response was "merely pretextual," the court found by a preponderance of the evidence that Lincare's "disparate treatment between Ms. Balderson and Mr. Brady was a result of discriminatory animus."  In reaching this conclusion, it stated that it was entitled to "infer the ultimate fact of sex discrimination" simply upon finding that Balderson had established a prima facie case and that Lincare's proffered reason for her termination was pretextual, citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11 (1993), and *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995).  The court stated that "the only difference between Mr. Brady's situation and Ms. Balderson's is that Mr. Brady is male and that Ms. Balderson is female" and therefore, it reasoned, their different punishments could *only* be explained by the difference in their sex.

From the district court's judgment, Lincare filed this appeal.  Balderson filed a cross-appeal, challenging the amount that the district court awarded her in compensatory damages.

13

II

Lincare contends that the district court clearly erred (1) in concluding that a "similarly-situated male" was treated differently than Balderson and, in any event, (2) in disregarding evidence that Balderson's termination "had nothing to do with gender discrimination" but instead was a business judgment made to enforce its compliance program. In essence, these challenges focus on (1) the requirement that, as an element of the prima facie case for discriminatory treatment, Balderson show that Brady was a comparator similarly situated to her "in all relevant respects" and (2) the ultimate requirement that to prove her claim, Balderson show, at least by inference, "discriminatory animus" — that is, the intent to discriminate because of sex.

The West Virginia Human Rights Act makes it unlawful "[f]or any employer to discriminate against an individual with respect to . . . tenure . . . if the individual is able and competent to perform the services required." W. Va. Code § 5-11-9(1). The term "discriminate" is defined by the Act to mean "to exclude from, or fail or refuse to extend to, a person equal opportunities because of . . . sex," or another prohibited ground. *Id.* § 5-11-3(h). The Supreme Court of Appeals of West Virginia has held that cases brought under the Act are "governed by the same analytical framework and structures developed under Title VII" of the Civil Rights Act of 1964, including the same "burden-shifting . . . framework for analyzing pretext claims." *Barefoot*, 457 S.E.2d at 159–60 (citing *St. Mary's Honor Ctr.*, 509 U.S. 502, and others). As the *Barefoot* court outlined, following the Supreme Court's Title VII cases, the "plaintiff must first create an inference of discrimination by establishing a *prima facie* case." *Id.* at 160. "The burden of production

14

then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Id*. "Finally, the plaintiff then is accorded an opportunity to demonstrate that either age, gender, or ancestry was a determinative factor in the defendant's employment decision or the defendant's articulated rationale was merely a pretext for discrimination." *Id*.

The U.S. Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), explained the holding of *St. Mary's Honor Center* in more detail:

> There [in *St. Mary's Honor Center*] we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct." In other words, "it is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."

*Id*. at 146–47 (cleaned up) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 524, 519).

The district court purported to follow this structure but, we conclude, erred both factually and legally. First, it clearly erred in concluding that the conduct of Balderson and Brady was "nearly indistinguishable." Second, it erred in concluding that because it had found that at least some of Lincare's proffered reasons for firing Balderson were *false*, those reasons were necessarily a pretext for the real reason of discriminating on the basis of sex. And finally, it erred in concluding that Balderson had carried the burden of demonstrating *intentional discrimination*, especially because Balderson herself denied that anything was ever said or done to make her think at the time that her gender had played any role in her employment or in the termination of her employment. On this last point,

15

the court proceeded from the premise that if Balderson proved both a prima facie case and that the reasons given by Lincare were pretextual, then unlawful discrimination must *automatically* follow.  *Reeves*, however, specifically rejected that reasoning.

Without the need to address whether the district court clearly erred in finding that Balderson had established a prima facie case and that Lincare's proffered reasons were false, we conclude that the *Reeves* error is dispositive.  Specifically, the district court assumed that because it had found (1) that Balderson had proved a prima facie case of disparate treatment and (2) that Lincare's explanation was not credible, it *necessarily* followed that it was permitted, without more, to "infer the ultimate fact of sex discrimination."  This legal analysis failed to faithfully apply the Supreme Court's prescriptions, as incorporated into West Virginia law.

In *Reeves*, the Supreme Court specifically addressed the question of "whether a plaintiff's prima facie case of discrimination . . . , combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination."  530 U.S. at 140.  The Court's conclusion was that such a showing *may* be sufficient but that it is not *necessarily* so — it depends on the circumstances.  The Court thus recognized that while there will be cases in which the "trier of fact [can] infer the ultimate fact of discrimination" from the combination of the plaintiff's prima facie case and "the factfinder's disbelief of the reasons put forward by the defendant," *id*. at 147 (cleaned up), it does not follow that "such a showing by the plaintiff will *always* be adequate to sustain a [factfinder's] finding of liability," *id*. at 148.  Instead, the Court observed, there will

16

"[c]ertainly . . . be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, *no rational factfinder could conclude that the action was discriminatory*." *Id.* (emphasis added).

The district court failed to recognize this possibility and to address it in light of the circumstances presented.  Had it done so, it would have been compelled to conclude that Balderson's case was one of the type recognized in *Reeves*, in which a prima facie showing of a similar comparator, combined with reasons to doubt the employer's explanations, is not sufficient to support a finding on the "ultimate" issue — the employer's discriminatory intent.  Here, while Balderson had presented sufficient evidence to prove that Lincare's decision to terminate her employment was unwise and even unfair, she failed at any stage to provide a basis for inferring that her discharge had anything to do with her sex.  In nonetheless holding Lincare liable, the court summarily concluded that Balderson had proved "discriminatory animus" because she and Brady were disciplined differently and "Mr. Brady is male [while] Ms. Balderson is female."  This truncated reasoning was not sufficient to support a conclusion that Lincare intentionally discriminated against Balderson *because of her sex*.

Balderson presented *no evidence*, explicit or implied, that would allow a factfinder to find that sex played any role in Lincare's decision to terminate her employment.  In her trial testimony, Balderson herself agreed that in her experience at Lincare before her termination, sex was never an issue — that "[n]o one ever made any gender-related comments directed at [her]."  She also testified that during the termination process, which involved Pederson's interview of her and a meeting with Brady, Pederson, and two other

senior Lincare officers, there was nothing "about [their] conduct that led [her] to believe that they were treating [her] differently because of [her] gender." Moreover, Pederson and her two colleagues who conducted the investigation leading to Balderson's termination were all female, and Lincare hired a female to replace Balderson. In short, there was no evidence that would permit the inference that gender was at play at any point during Balderson's employment and the process of her termination. Yet, as *Reeves* makes clear, "although intermediate evidentiary burdens shift back and forth," Balderson retained "the ultimate burden" to establish that Lincare intentionally discriminated against her on the basis of sex. *Reeves*, 530 U.S. at 143 (cleaned up). "In other words, it is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination" — in this case, that Lincare fired Balderson because of her sex. *Id*. at 147 (cleaned up).

Not only was the record bare of evidence that Balderson's sex played a role in her termination, the district court clearly erred in finding, as the core of its cursory analysis, that the two employees' circumstances were "nearly indistinguishable." Based on that finding, the court essentially reasoned that the disparity of their punishments could *only* be explained as sex discrimination. That finding, however, does not fit the facts.

While Brady and Balderson engaged in *similar* conduct in providing "leading" information to physicians, it is just not the case that the "only difference" between them was sex. Balderson was a sales representative who, because she earned the majority of her compensation from commissions, had a direct financial incentive to increase her sales as much as possible, including by reducing any friction in a sale's being completed.

18

Moreover, under the agreement between Balderson and Lincare governing her receipt of commissions, she could only receive such payments if she "personally obtain[ed] all . . . billing pre-requisites" necessary for Lincare to receive payment from the patient's insurance provider, including a statement from the doctor explaining why the product was medically necessary. And, as a normal part of her job duties, when the Parkersburg center received a ventilator order from a physician's office, Balderson was charged with "review[ing] [the] order for accuracy and completeness" and "look[ing] at the progress notes to make sure that [the] piece of equipment would be covered [by insurance] based on what the physician had documented in their progress note" before submitting the order for approval. If a progress note did not "contain all the information that would be needed for approval by Lincare," Balderson had been trained to "educate the physician on what was missing and what was needed to get [the] order completed."

By contrast, Brady's job description made clear that, as the Parkersburg center's manager, he did not have "sales responsibility" and, consistent with that, he did not earn commissions. Moreover, while Brady would sometimes review ventilator orders for completeness if Balderson was out of the office, that only happened "one or two times every [two or] three months," and conducting such a review was not "part of [his] normal job duties."

In addition to this major difference with respect to their respective job responsibilities and the nature of their positions, the conduct for which they were disciplined also differed. During Pedersen's investigation of the origin of the cloned notes found in 19 patient files, Balderson admitted that she had regularly been using the

19

handwritten template progress notes for some one-and-a-half to two years prior to her termination, knowing that the template notes would be added directly to patient files once they were signed by the physician.  Pederson later testified that by sending such notes to physicians, Balderson had "significantly . . . put [the] physician[s'] practice at risk."  In addition, she indicated that the use of such notes also increased the risk of inaccurate information being introduced into the documentation used to justify payments from insurance companies and the government.  Brady, on the other hand, was found to have sent physicians a page with *three different* "Good Chart Notes *Examples*."  (Emphasis added).  While Brady likely should have foreseen that some physicians would use the language from those examples "in a substantially similar form," as the investigation indeed revealed had been done, Brady, as the district court noted, "never intended physicians to use his example language as a 'word-for-word copy/paste' template."  Yet, it was undisputed that Balderson had that exact intent, and she actually kept copies of blank template notes in her possession with the intent to facilitate physicians' use of them.

Thus, although the district court concluded that Brady's and Balderson's relevant conduct was not just similar but "nearly indistinguishable" and even "the same," the record and the court's own underlying findings do not support that conclusion.  As such, that finding, which lay at the heart of the district court's analysis, was clearly erroneous.  Under the facts as proved, Lincare could have reasonably concluded — as Pedersen testified that she had concluded — that the difference between the two practices was material.  Moreover, even if the district court was convinced that Balderson's and Brady's conduct was so similar that fairness required them to receive the same discipline, the question for

20

the court was not whether Lincare had made a good, equitable, or even fair decision. It was instead whether *the actual reason* for their disparate discipline was that Balderson was a woman and Brady was a man.

While Balderson may have made a case that Lincare's decision to fire her was a poor one and not in the best interests of the company — a proposition with which we might agree, especially in view of the fact that Balderson was such a valuable producer for the company and the incident in this case was her first infraction — that does not lead to the conclusion that Balderson was discharged *because of her sex*. Because there is no evidence to support that finding, we reverse the judgment of the district court.

REVERSED