**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 25-1124**

_____

WANDA JOHNSON,

Plaintiff - Appellant,

v.

BALTIMORE CITY, MARYLAND; BALTIMORE POLICE DEPARTMENT,

Defendant - Appellee.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Richard D. Bennett, Senior District Judge.  (1:23-cv-02215-RDB)

_____

Argued:  October 23, 2025                    Decided:  January 6, 2026

_____

Before WILKINSON, KING, and THACKER, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opinion. Judge Thacker wrote the opinion in which Judge King joined.  Judge Wilkinson wrote a dissenting opinion.

_____

**ARGUED:**  Dionna Maria Lewis, DISTRICT LEGAL GROUP, PLLC, Washington, D.C., for Appellant.  Christine Ellen White, CITY OF BALTIMORE LAW DEPARTMENT, Baltimore, Maryland, for Appellees. **ON BRIEF:**  Stephen L. Fowler, DISTRICT LEGAL GROUP, PLLC, Washington, D.C., for Appellant.  Ebony M. Thompson, Baltimore City Solicitor, Michael Redmond, Director, Appellate Practice Group, Kara K. Lynch, Chief Solicitor, Natalie R. Amato, Chief Counsel for Consent Decree, CITY OF BALTIMORE LAW DEPARTMENT, Baltimore, Maryland, for Appellee.

_____

THACKER, Circuit Judge:

Wanda Johnson ("Appellant") alleges that her former employer, the Baltimore Police Department ("Appellee"), discriminated against her on the basis of race and later retaliated against her, in violation of Title VII of the Civil Rights Act of 1964. Appellant further raises a *Monell*[1] claim alleging Appellee violated her civil rights.[2] The district court granted Appellee's motion to dismiss, concluding that Appellant failed to allege plausible claims for which relief can be granted.

Because Appellant has alleged that multiple white or non-black comparators engaged in similar conduct to her own but received disparate treatment, we conclude Appellant has sufficiently alleged a racial discrimination claim. However, because the chain of events leading to Appellant's termination began long before Appellant engaged in any protected activity, we conclude Appellant's retaliation claim was properly dismissed. As to Appellant's *Monell* claim, we conclude the complaint lacks specific factual allegations of a widespread pattern or practice.

Accordingly, we affirm in part, reverse in part, and remand.

---

[1] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

[2] A *Monell* claim refers to an action filed against a municipality for violating an individual's constitutional rights pursuant to 42 U.S.C. § 1983. Pursuant to *Monell,* a plaintiff may "hold a municipality liable for a constitutional violation under § 1983, [by establishing] that the execution of a policy or custom of the municipality caused the violation." *Misjuns v. City of Lynchburg*, 139 F.4th 378, 384 (4th Cir. 2025) (citation omitted).

I.

This case began on August 26, 2018, when Appellant, an African American police officer employed by Appellee, was at a nightclub celebrating her bachelorette party. An altercation occurred outside of the nightclub between a member of Appellant's party and an on duty Baltimore police officer, Sergeant Marlon Koushall, during which Koushall struck Appellant's friend, a woman, in the face. A security guard present at the scene testified that Koushall "pulled back his fist all the way and then hit [Appellant's friend]." *Koushall v. State*, 246 A.3d 764, 768 (Md. Ct. Spec. App. 2021).

Following the incident, Appellee's Internal Affairs Division ("Internal Affairs") interviewed all parties present, including Appellant. When the Office of the State's Attorney for Baltimore City ("State's Attorney") received the case and reviewed the evidence, it "decided to . . . pursue charges against Mr. Koushall." *Koushall*, 246 A.3d at 768. And, as detailed below, Koushall was ultimately indicted and convicted for this conduct.

A grand jury was convened and, in January 2019, Appellant testified before the grand jury against Koushall regarding the nightclub incident. According to Appellant's Complaint, following her grand jury testimony, Appellant was told by Lieutenant Mark Walrath that "she was being 'blackballed' by [Appellee] and that 'Internal Affairs is up your a**.'" J.A. 48.[3] In February 2019, Koushall was indicted for second degree assault and misconduct in office.

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

In June of the same year, Internal Affairs notified Appellant that she was being investigated in relation to the incident.  Internal Affairs turned their investigation of Appellant over to the State's Attorney for assessment of criminal charges.  The State's Attorney declined to bring any charges against Appellant or any other member of Appellant's party.

The State's Attorney proceeded to trial against Koushall.  During the bench trial, which took place in September and October 2019, Appellant testified against Koushall for the prosecution.  Following her testimony, Assistant State's Attorney Steve Trostle told Appellant, "I feel bad for you; just be prepared that the shit storm is coming because [Internal Affairs] is coming for you."  J.A. 48–49.  Koushall was found guilty of second degree assault and misconduct in office.  As a result of his conviction, Koushall was suspended and placed on supervised probation pending the appeal of his conviction.  But, of note, Appellee never pursued Koushall's removal from employment.  His conviction was twice affirmed on appeal; first, by the Appellate Court of Maryland and then by the Maryland Supreme Court.[4]  *See Koushall v. State*, 246 A.3d 764 (Md. Ct. Spec. App. 2021); *Koushall v. State*, 277 A.3d 403 (Md. 2022).  Yet, Koushall continues to remain employed by Appellee.  Oral Argument at 2:37:12–2:37:29, *Wanda Johnson v. Baltimore City, Maryland: Baltimore Police Dep't*, No. 25-1124 (4th Cir. Oct. 23, 2025),

---

[4] At the time, the Appellate Court of Maryland was named the "Maryland Court of Special Appeals."  At the November 8, 2022, general election, Maryland changed the name to the "Appellate Court of Maryland."  The name change took effect on December 14, 2022.  During the same election, the "Court of Appeals of Maryland" was renamed to the "Maryland Supreme Court."

https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.      ("It's      my

understanding that Sergeant Koushall does still work for [Appellee].").

On June 4, 2020, Internal Affairs interviewed Appellant as part of the investigation

against her. And on June 11, 2020, Internal Affairs filed disciplinary charges against

Appellant for "committing an assault on August 26, 2018, failing to notify her supervisors

of the assault on August 26, 2018, making false statements in her interview on August 26,

2018, and making false statements in her interview on June 4, 2020." J.A. 83–84.

Following these charges, Appellant was suspended with pay.

Thereafter, on February 16, 2021, Appellant filed a claim with the United States

Equal Opportunity Commission (the "EEOC Complaint"), alleging she was subjected to

"unequal terms and conditions of employment when [she] was informed that [Appellee]

was seeking to keep [her] on suspension while seeking termination for allegedly making

false statements during the investigation." J.A. 6. In contrast, Appellant alleged, multiple

white Baltimore Police Department officers who had made false statements during

investigations were suspended but not terminated. As a result, Appellant averred that she

was "discriminated against . . . based on [her] race (Black) and in retaliation for engaging

in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended."

J.A. 7.

5

Despite the EEOC Complaint, the disciplinary charges against Appellant proceeded to an administrative trial board hearing on May 24–25, 2022.[5]  Appellant alleges she learned during these proceedings that a fellow Baltimore Police Department officer, Officer Yolanda Nelson, filed a false report about the nightclub incident wherein Officer Nelson claimed that two witnesses identified Appellant as the attacker.  Appellant alleges that the falsity of the report became apparent during the administrative trial board hearing because Officer Nelson's statements were contradicted by her own body camera footage. Detective Bruce Gertz, the investigator assigned to the internal investigation against Appellant, testified that he had reviewed Officer Nelson's body-worn camera footage and written report and observed discrepancies between the two.  Yet, according to Appellant, Detective Gertz "neither questioned nor charged Officer Nelson for submitting a false report and giving a false statement."  J.A. 56.

On May 31, 2022, Appellant filed an internal complaint with the Police Integrity Bureau against Officer Nelson and Detective Gertz alleging unfair and *disparate* treatment. Appellant was forced by Appellee to submit her resignation in lieu of termination the next day, June 1, 2022.

The following year, "[b]ecause over 180 days had elapsed since the EEOC assumed jurisdiction over [Appellant's] complaint, on August 22, 2022, [Appellant] requested the

---

[5] Although our dissenting colleague chastises the majority for "never directly acknowledg[ing] that the trial board found [Appellant] guilty," Post at 33, curiously neither does Appellee.  Nowhere in the briefing or during oral argument did Appellee refer to Appellant as "guilty" of anything.  Nonetheless, we, of course, acknowledge that the charges in Appellant's administrative board hearing were sustained.

issuance of a Right-to-Sue Letter." J.A. 44. And, "[i]n response, the [EEOC] issued [Appellant] a Notice of Right to Sue, which [Appellant] received on May 15, 2023." J.A. 44. Then, on August 14, 2023, Appellant filed her original complaint in the district court, which brought five counts against Appellee. However, the district court concluded that Appellant's complaint failed to state any plausible claim, and it dismissed the complaint without prejudice.

Appellant filed an Amended Complaint on June 14, 2024, and she brought the same five claims: race discrimination pursuant to Title VII (Count I); hostile work environment pursuant to Title VII (Count II); retaliation pursuant to Title VII (Count III); municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Count IV); and violations of Maryland's Fair Employment Practices Act (Count V).

But, the district court again dismissed Appellant's Amended Complaint for failure to state a claim, this time with prejudice.

This appeal timely followed. Appellant appeals only the dismissal of Counts I, III, and IV.

## II.

We review a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo. *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025) (citing *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024)). In conducting such a review, we accept the complaint's factual allegations as true and construe the facts in the light most favorable to the plaintiff. *Barbour*, 105 F.4th at 589 (citing *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018)).

7

To survive a motion to dismiss, a complaint must contain sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

## III.

Appellant contends that the district court erred by dismissing her Title VII racial discrimination and retaliation claims, along with her *Monell* claim. We agree as to the race discrimination claim, but we conclude the district court did not err in dismissing the retaliation and *Monell* claims.

## A.

### Race Discrimination Claim

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C § 2000e–2(a); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). To survive a motion to dismiss a Title VII race discrimination claim, the complaint must allege facts "that plausibly state a violation of Title VII above a speculative level." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman*, 626 F.3d at 190) (internal quotation marks omitted). A claim for discrimination pursuant to Section 1983 need not establish a prima facie case. But it must "allege facts to satisfy the elements of a cause of

8

action created by that statute." *Id.* (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)).  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a 12(b)(6) motion, a complaint survives if it states a plausible claim for relief that permits the court to "infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

A plaintiff can establish a claim of racial discrimination pursuant to Title VII by employing one of two methods of proof: (1) demonstrating through direct evidence that her race was a motivating factor in the employer's adverse employment action; or (2) relying on the burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019); *see also Wannamaker-Amos v. Purem Novi Inc.*, 126 F.4th 244, 255 (4th Cir. 2025).

Here, Appellant does not argue that she plausibly demonstrated her race was a motivating factor in Appellee's adverse employment action.  She instead frames her race discrimination argument on the burden shifting scheme in *McDonnell Douglas*.  Pursuant to the *McDonnell Douglas* framework, a prima facie case of discrimination requires a showing of: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." *Wannamaker-Amos*, 126 F.4th at 255; *see also Noonan v. Consolidated Shoe Co., Inc.,* 84 F.4th 566, 572 (4th Cir. 2023).  Courts frequently reframe the fourth element of a race discrimination claim

9

pursuant to Title VII as "similarly situated comparators." *Noonan*, 84 F.4th at 573; *see also Tabb v. Bd. of Educ., of Durham Pub. Schs.*, 29 F.4th 148, 157 (4th Cir. 2022). This is so because the fourth element can be met by establishing "similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004) (citations omitted).

Here, the parties agree that the Amended Complaint sufficiently alleged the first and second elements, that is, Appellant's membership in a protected class and her satisfactory job performance. The district court further determined that Appellant's "allegation that she was forced to resign satisfies the adverse action requirement of Plaintiff's disparate treatment under Title VII." J.A. 29. That conclusion is unchallenged by Appellee. Accordingly, the only element at issue is whether Appellant sufficiently alleged in her Amended Complaint that "similarly situated [comparators] outside the protected class received more favorable treatment." *White*, 375 F.3d at 295.

"A claim of discrimination in the enforcement of employee disciplinary measures by reference to a comparator requires that the plaintiff's prohibited conduct was comparable in seriousness to the misconduct of employees outside the protected class, and the disciplinary measures enforced against the plaintiff were more severe than those enforced against other employees." *Seabrook v. Driscoll*, 148 F.4th 264, 270 (4th Cir. 2025) (cleaned up) (citation omitted). "The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008).

10

Specifically, there must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (internal quotation marks omitted) (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)). While there is no "bright-line" rule for what makes two comparators "similar" for purposes of Title VII claims, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Spencer v. Virginia State University*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (concluding that factors rendering comparators similar include whether they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct."); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381 (4th Cir. 2022).

In *Haynes v. Waste Connections*, the plaintiff, an African American employee, filed suit pursuant to Title VII and 42 U.S.C. § 1981 against his employer, alleging he was unlawfully terminated due to his race. At issue was whether the plaintiff produced sufficient similarly situated comparators. In support of his claim, the plaintiff produced evidence that a white employee, under the same supervisor as himself, had several workplace infractions but was permitted to return to work, while the plaintiff with fewer infractions and less "egregious" conduct was terminated. *Haynes,* 922 F.3d at 224. In

11

opposition, the employer argued that the nature of the plaintiff's previous infractions rendered the white employee an inappropriate comparator because the plaintiff's infractions allegedly caused property damage while the white employee's did not. We rejected the employer's argument and found the plaintiff had identified sufficiently similarly situated comparators because the different severity levels of the infractions did not necessarily end the comparator analysis. Instead, we held, "a comparison between similar employees 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.'" *Id.* at 223 (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)).

Here, Appellant identified thirteen "similarly situated comparators" for her Title VII disparate treatment claim. These include:

- A white male police officer who used the "n-slur," and in response was given the opportunity to retire without reprimand;

- A white male police officer with several DUI charges and a fleeing and eluding charge who was ultimately suspended but later reinstated at the same rank;

- A white male police officer who was charged with "use of force" against a man suffering from a mental health crisis but was not suspended;

- A white female police officer charged with multiple uses of force and false statement charges but who was not suspended and has since been promoted in rank;

- A white female police officer involved in a domestic assault and charged with making false statements who was initially suspended, but the suspension was later dismissed along with the charge, and she was later promoted to Sergeant;

12

- A white male police officer, the counterpart to the above domestic assault and false statement charge, similarly had his charges and suspensions dropped and was promoted to Lieutenant;

- A white male police officer who physically assaulted another officer but no charges were filed;

- A white female police officer charged with disorderly conduct and misconduct who was suspended but later retained and promoted to Major;

- A non-black female police officer who made a false statement but was not charged;

- Detective Gertz, a white male police officer involved in Appellant's disciplinary hearing, who made a false statement but "never faced any consequence[s]" J.A. 52;

- A white male police officer who breached protocol by failing to report his crashing of a Baltimore Police Department vehicle and was suspended and demoted but not terminated nor forced to resign;

- A white male police officer charged with tampering with an internal investigation and making false statements was neither terminated nor forced to resign; and

- Sgt. Koushall, who the complaint alleges is a "non-black" male police officer, was found guilty of assault and misconduct and allegedly made false statements during his trial, but was neither terminated nor forced to resign.[6]

J.A. 50–54.

---

[6] At oral argument, Appellee's counsel asserted that "Sergeant Koushall is black." Oral Argument at 2:28:38–45, *Wanda Johnson v. Baltimore City, Maryland: Baltimore Police Dep't*, No. 25-1124 (4th Cir. Oct. 23, 2025), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. However, because this case comes to us at the motion to dismiss stage, we are bound to accept as true Appellant's allegation of Koushall as "non-black."

The district court held that none of the 13 other employees that Appellant identified were sufficiently similar to Appellant to qualify as comparators based on the ground that "none were accused of and found guilty following a trial board of misconduct similar to [Appellant]." J.A. 101. In doing so, the district court required a perfect one-to-one match between proffered comparators' conduct and Appellant's alleged conduct that included "assault, failing to notify her supervisors of the assault, and [] making false statements on two separate occasions relating to an investigation." *Id.* at 104. This was in error.

At this stage of litigation, viewing the facts in the light favorable to Appellant, we conclude that Appellant has alleged sufficient facts to demonstrate similar comparators so as to allow for a reasonable inference as to their similarities to Appellant. First, Appellant and all the proposed comparators are Baltimore police officers, and, therefore, subject to the same standards. Second, while no single comparator perfectly aligns with every incident of Appellant's conduct, the analysis does not require a perfect one on one fit. *See Haynes*, 922 F.3d at 223 ("[A] comparison between similar employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.") (internal quotation marks omitted). Instead, the analysis focuses on the "similarity between [the] comparators" and their conduct such that a jury could reach an inference of discrimination, so long as the comparison is "meaningful." *See Lightner*, 545 F.3d at 265. The comparators here fit within those parameters.

Appellant was charged with misconduct for assault, failing to notify her supervisors of assault, and making false statements. Many of the comparators Appellant points to

14

allegedly committed the same or similar offenses as Appellant. Indeed, Appellant's complaint alleges at least six other officers who were charged with assault and seven others who allegedly made false statements -- all without being suspended and terminated. For example, Appellant's bullet point four contained in paragraph 54 of the Amended Complaint alleges that a white female police officer "had several sustained uses of force and false statement charges brought against her" but nevertheless was not suspended and instead was later promoted to Sergeant. J.A. 51. As another example, the allegation contained in paragraph 54, bullet point 5, of the Amended Complaint is that a white female police officer was involved in a domestic assault and charged with making false statements to a different police department, but her trial board hearing was dismissed "due to what was referred to as an improper investigation" and she was later promoted to Sergeant. *Id*. This domestic assault and false statement charge involved another police officer, a white male, whose charges were dismissed and he was promoted to Lieutenant. Yet another comparator is a non-black female police officer whom the Amended Complaint alleges was never charged for making false statements that were directly contradicted by bodycam footage.

And then, of course, there is Koushall, who "pulled back his fist all the way and then hit" a woman in the face. *Koushall v. State*, 249 Md. App 717, 724 (Md. Ct. Spec. App.). Based on this conduct, stemming from the exact 2018 nightclub incident in which Appellant was involved, Koushall was found guilty of assault and misconduct following a bench trial. And according to Appellant, Koushall also "made multiple false

15

statements . . . during his trial testimony." J.A. 53. Yet, Koushall was never terminated, forced to resign, or even demoted. He continues to work as a police officer for Appellee.

Taking all the allegations together, Appellant has provided multiple white or non-black comparators who allegedly engaged in similar conduct to Appellant but received disparate treatment. The dissent contends, however, that the proffered comparators must be similar "in all respects." Post at 28. But this is only partially accurate. Instead, what our case law requires are comparators that are similar "in all *relevant* respects." *Cowgill*, 41 F.4th at 382 (emphasis supplied); *Haynes*, 922 F.3d at 225. For each comparator, Appellant details their position, race, conduct, and the consequences, if any, for the conduct – that is, the *relevant* facts for a comparator analysis for someone in Appellant's position. Appellant alleged sufficiently similar comparators for a jury to reasonably infer their similarity because the comparators: (1) engaged in similar conduct; (2) held the same position; and (3) were assumingly subject to the same set of standards. Consequently, the complaint alleges sufficient facts, accepted as true, to state "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (2007)).

The dissent points to *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 715 (4th Cir. 2024) for the argument that the comparators here are distinguishable from Appellant because she was "more strictly disciplin[ed]" as an employee "who [was] proven – not just rumored – to be a bad apple." Post at 33. And while it is true that some of the comparators that Appellant points to were not "proven" to have engaged in the misconduct, this does not doom her claim. We need only look to the very case the dissent cites to see why. The dissent posits that in *Cosby*, this court found that the comparator was not valid

16

because "rumors" of a romantic relationship were not the same as a formal investigation. Post at 33; *Cosby*, 93 F.4th at 715–16. But, in *Cosby*, the rumored engagement in a romantic relationship was not the conduct at issue. Rather, it was the "*alterati[on of] a subordinate's job conditions*, or otherwise subjecting a subordinate to a hostile work environment, after having a sexual relationship with that subordinate," that was the conduct that was at the heart of the case. *Id*. at 716 (emphasis in original). Therefore, the dissent's claim that Appellant's conduct and her proffered comparators' conduct were not sufficiently similar because they were not found "guilty," is misguided in the larger context of the case which the dissent cites for support.

Of course, we take no issue with Appellee's attempt to "assure accountability for misdeeds within their ranks." Post at 37. But, the point is that we want to ensure Appellee does so in a nondiscriminatory manner. *See Smith v. Univ. of North Carolina*, 632 F.2d 316, 346 (4th Cir. 1980) ("[T]he law does not require, in the first instance, that employment be rational, wise, or well-considered – only that it be nondiscriminatory."); *see also Balderson v. Lincare Inc.*, 62 F.4th 156, 166 (4th Cir. 2023) (holding that "the question for the court [is] not whether [the employer] had made a good, equitable, or even fair decision," rather it is whether the actual reason for the disparate treatment was discriminatory in nature).

Therefore, we reverse the dismissal of Count I and remand for further proceedings.

B.

Retaliation Claim

Title VII also prohibits an employer from retaliating against an employee for complaining about prior discrimination or retaliation. 42 U.S.C. § 2000e–3(a). As with a discrimination claim, a plaintiff may prove Title VII retaliation claims through either direct evidence of retaliatory animus, or through the *McDonnell-Douglas* framework. *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). To prevail on a retaliation claim pursuant to the *McDonnell-Douglas* framework, a plaintiff must first establish a prima facie case by showing that: (1) she engaged in protected activity, (2) the employer took adverse action against her, and (3) a causal relationship existed between the protected activity and the adverse employment action. *Id.* at 250; *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2024). Again, at the motion to dismiss stage, a plaintiff need not establish a prima facie case. Rather, a plaintiff must merely produce sufficient allegations, accepted as true, to state "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

It is uncontested on appeal that Appellant engaged in a protected activity by filing her EEOC Complaint on February 16, 2021, and by filing a complaint with Internal Affairs on May 31, 2022. It is further uncontested that Appellant experienced an adverse employment action through her forced resignation on June 1, 2022. This leaves only the "causal link" element at issue on appeal.

A plaintiff may demonstrate that a protected activity caused an adverse action through either one of two routes: (1) by establishing a "temporal proximity between the

18

protected activity and adverse action," or (2) by establishing that "other relevant evidence indicates 'continuing retaliatory conduct and animus' toward the plaintiff." *Alberti v. Rector and Visitors of the University of Virginia*, 65 F.4th 151, 156 (4th Cir. 2023) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)). Therefore, the absence of temporal proximity alone is not fatal, as courts "may look to the intervening period for other evidence of retaliatory animus." *Lettieri*, 478 F.3d at 650 (providing that the existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action). "Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Id*. (citation omitted).

On February 16, 2021, Appellant filed her EEOC Complaint, and on May 31, 2022, she filed an internal complaint with Appellee -- both protected activities. On June 1, 2022, Appellant was forced to resign -- an adverse action. This one day temporal proximity between Appellant's protected activity and the adverse action could satisfy the "but-for connection" required for the causal link element in a retaliation claim. However, temporal proximity also requires the relevant decisionmaker to have been "actually aware of the protected activity before making their decision." *Barnhill*, 138 F.4th at 132. In her Amended Complaint, Appellant alleges Appellee "knew of [Appellant's] engagement in protected activity prior to engaging in the [prior] adverse actions when they were informed by [Appellant] directly, advised by an [Equal Employment Opportunity Commission] representative, or otherwise should have known that [Appellant] engaged in the complaint process based on her informal and formal complaint filings." J.A. 64. While we draw all

19

reasonable inferences in the Appellant's favor, we are constrained to conclude that Appellant's Amended Complaint does not allege Appellees' knowledge of her Internal Affairs complaint "above the speculative level." *Evans v. United States*, 105 F.4th 606, 616 (4th Cir. 2024); *see also Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) ("[L]egal conclusions pleaded as factual allegations, unwarranted inferences, unreasonable conclusions, and naked assertions devoid of further factual enhancement are not entitled to the presumption of truth.") (internal quotation marks omitted).

Here, Appellant does not cite to or allege any underlying facts to support this conclusory assertion. Accordingly, the causal link element is not satisfied based on temporal proximity alone for her May 31, 2022, protected activity. The temporal causal nexus is similarly lacking with respect to Appellant's February 16, 2021 EEOC Complaint, as over a year passed between the EEOC Complaint and the forced termination. *See Barnhill*, 138 F.4th at 132 ("[T]he gap between the protected activity and the adverse employment action can generally be no longer than two months."); *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (three months was insufficient to infer a causal relationship without other evidence of a causal link).

Still, this conclusion is not fatal to Appellant's claim, as Appellant's claim can survive if she has alleged "continuing retaliatory conduct and animus" following her protected activity. *Alberti*, 65 F.4th at 156. "[I]ntervening events can bridge what would otherwise be a prohibitively long temporal gap." *Barbour v. Garland*, 105 F.4th 579, 593 (4th Cir. 2024) (citing *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022)).

20

Accepting Appellant's allegations as true at this stage of the litigation, it is clear that Appellant was unfairly treated over the course of two years with respect to the Internal Affairs investigation. Yet, the events here do not support a plausible inference of a causal link between the protected activity -- the February 16, 2021 EEOC Complaint -- and the forced termination because the chain was set off *long before* Appellant filed her EEOC complaint. Appellee's trial board hearing and forced resignation followed from charges initially levied against Appellant in June of 2020 -- eight months before she filed her EEOC Complaint.

In support of Appellant's argument that there was "continuing retaliatory conduct and animus" following her EEOC filing on February 16, 2021, she points to the two instances in which she was informed Internal Affairs would be involved: (1) in early 2019, before Internal Affairs informed Appellant that she was being investigated, Lieutenant Mark Walrath allegedly told Appellant she was being "blackballed" by Appellee and that "Internal Affairs is up your a**;" and (2) following Appellant's testimony in Koushall's trial, Assistant State's Attorney Steve Trostle allegedly said to Appellant, "I feel bad for you; just be prepared that the shit storm in coming because [Internal Affairs] is coming for you." J.A. 48–49; *see Barnhill*, 138 F.4th at 132 ("[E]ven in the absence of temporal proximity, causation can be established through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity.").

In *Holloway v. Maryland*, 32 F.4th 293 (4th Cir. 2022), we found intervening comments made by the plaintiff's supervisor bridged a typically prohibitively long gap between the plaintiff's protected activity and subsequent adverse action as to establish

21

causation.  In *Holloway*, the plaintiff filed his EEOC complaint on May 29, 2018.  The plaintiff's supervisor told plaintiff in June that he knew of the EEOC complaint and that he "would be involved," and the plaintiff was fired by August.  *Id*. at 297.  We acknowledged in *Holloway* that because there was almost a three month period between the protected activity and adverse action, it did not support a finding of a causal link.  However, it was the intervening comment by the plaintiff's supervisor that "temper[ed] the temporal gap" between the protected activity and adverse action, allowing us to infer the plaintiff was terminated "because" of his protected activity.  *Id*. at 300 (citing 42 U.S.C. § 2000e-3(a)).

In contrast, in the case at hand, the statements relating to Internal Affairs' involvement *pre-date* Appellant's EEOC Complaint and are, therefore, not intervening events.  Accordingly, Appellant's allegations as pled cannot support a reasonable inference of retaliation because Appellee's conduct is consistent with pursuing charges it lodged against Appellant nearly a year before she filed her EEOC Complaint.  And Appellant does not make plausible allegations that the comments made by Lieutenant Walrath and Assistant State's Attorney Trostle regarding Internal Affairs' involvement with the investigation were sufficient "intervening events [to] bridge [an] otherwise [] prohibitively long temporal gap." *Barbour*, 105 F.4th at 593.

Similarly, there is no evidence or allegation to demonstrate "continuing retaliatory conduct and animus" in the short one day span between Appellant's Internal Affairs complaint and her forced resignation.

Therefore, we affirm the district court's dismissal of Appellant's retaliation claim pursuant to Title VII.

22

C.

*Monell* Claim

42 U.S.C. § 1983 provides an avenue for plaintiffs to file suit against any person who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see also Filarsky v. Delia*, 566 U.S. 377 (2012). In *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court determined that "municipalities and other local government units" are "persons" within the meaning of § 1983 and thus amendable to suit under the statute.

To hold a municipality liable for a constitutional violation pursuant to *Monell*, a plaintiff must establish "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (*citing Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).  An official policy or custom may be expressed in four ways:

> (1) [T]hrough an express policy, such as  such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Id.* at 952 (citing *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003))).

In her Amended Complaint, Appellant contends Appellee:

23

> unlawfully deprived [Appellant] of her civil rights in violation of Sections 1981 and 1983 of the Civil Rights Act and the First Amendment when it retaliated against [Appellant] for having engaged in protected activity by complaining of discrimination on the basis of her race…[and] she was illegally subjected to a pattern of further retaliation, harassment, and disparate treatment.

J.A. 66–67.

Appellant alleges these acts were "part of an institutional practice or custom, constituting an official policy of [Appellee] to cover up officer misconduct, discrimination, and retaliation against fellow officers who stand up against the Department for violations of their civil rights." J.A. 67. Accordingly, Appellant's *Monell* claim requires her to allege the existence of a practice that is so "persistent and widespread as to constitute a custom or usage with the force of law," often referred to as the theory of custom "by condonation." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotation marks omitted); *see also Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014).

To prevail under this theory, a plaintiff must point to a "persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Owens*, 767 F.3d at 402 (internal quotation marks omitted) (citations omitted). Sporadic or isolated violations of rights will not give rise to *Monell* liability; only "widespread or flagrant" violations will. *Id.* at 402–03.

That means "proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Semple v. City of Moundsville*, 195 F.3d 708, 713–14 (4th Cir. 1999) (citation omitted); *see also Howard*, 68 F.4th at 954

24

("[b]ut fatally to his claim, Howard offers evidence of only a single incident of unconstitutional activity: the incident in this very case. And 'proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom'") (citing *Semple,* 195 F.3d at 713–14). Rather, there must be "numerous particular instances of unconstitutional conduct to establish a custom or practice." *Misjuns v. City of Lynchburg*, 139 F.4th 378, 386 (4th Cir. 2025) ("[t]he only facts that Misjuns alleged are regarding his own termination, and a custom cannot be established by proof alone of the single violation charged. . . . Misjuns has alleged none other than his own experience.") (internal quotation marks omitted).

Here, the only specific instances Appellant alleges in support of her *Monell* claim are her own. As noted, we have previously held this insufficient to support a reasonable inference that there is a "persistent and widespread practice" so as to plausibly allege a *Monell* claim. Otherwise, the Amended Complaint merely refers generally to "a custom of discrimination," and "an institutional practice or custom . . . to cover up officer misconduct, discrimination and retaliation against fellow officers who stand up against [Appellee] for violations of their civil rights." J.A. 67–68. That bare, conclusory allegation is not enough.

Appellant disagrees. In support of her contrary position, she argues that her Amended Complaint sufficiently alleged the required factual allegations by stating:

> It is well-known throughout the Department that [Appellee] routinely suspends officers for extended periods, keeps them in the dark during false investigations, and ultimately forces them out of the Department. Black officers, in particular, have been targeted and have suffered these injustices for far too

25

long; [Appellant] and her husband were not the only ones affected by this systematic mistreatment.

J.A. 58.

But this allegation is insufficient to cross the plausibility threshold. A comparison with *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014) demonstrates why. In *Owens*, the plaintiff alleged that "[r]eported and unreported cases from the period of time before and during the events complained of" and "a number of motions [] filed and granted during this time period [] demonstrate that [the defendant] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it." *Owens*, 767 F.3d at 403. We determined "the assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id*. But, we also recognized "that courts have dismissed *Monell* claims when the plaintiff has alleged nothing more than a municipality's adherence to an impermissible custom." *Id*. We reasoned that the plaintiff in *Owens* had "done more than that: [the plaintiff] has alleged facts—the existence of 'reported and unreported cases' and numerous 'successful motions.'" *Id*.

In contrast, in the present appeal, while Appellant broadly references violations outside her own, her allegations are far too general to be considered sufficient to survive the motion to dismiss stage. Accordingly, in the absence of more specific factual allegations of a widespread pattern of practice, the district court did not err in dismissing Appellant's *Monell* claim.

26

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

WILKINSON, Circuit Judge, dissenting:

I agree with the majority's disposition of the retaliation and *Monell* claims. I would, however, affirm the district court's entire judgment, including its dismissal of plaintiff's racial discrimination claim under Title VII. After a two-year investigation and two-day administrative hearing, Wanda Johnson was found guilty of assaulting a patron at Norma Jean's; failing to notify her supervisors of the assault; and, on two occasions, lying to investigators. In response, Johnson says, the Baltimore Police Department ("BPD") forced her to resign. Assuming she is right, the BPD's decision to do so was both lawful and reasonable. Law enforcement officials cannot function without trusting one another, and the BPD in particular has worked hard of late to rid itself of the many credibility issues plaguing its workforce.

The majority disrupts this progress by entertaining Johnson's lawsuit beyond its worth. To plead a prima facie case of disparate treatment, of course, Johnson must allege that the BPD more favorably treated employees who were "not just similar in *some* respects, but 'similarly-situated *in all respects*'" besides race. *Spencer v. Va. State Univ.*, 919 F.3d 199, 207–08 (4th Cir. 2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Johnson's amended complaint, however, describes merely a hodgepodge of BPD employees who all differed from her in material ways—be it in their rank, misconduct, or guilt. Because her case is bound to fail, I dissent from stringing it along any further.

28

I.

In practically every workplace, there must be a "special relationship of trust between the employer and employee." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993). Most jobs, for instance, require that subordinates "gain access to privileged information regarding the employer's particular business practices, methods of production, names of customers, and so forth"—all of which would be destructive to the organization if disclosed. *Id.* Trust is also essential to building cohesion between workers, and to facilitating both cooperation and positive morale to the ultimate benefit of consumers. *See, e.g.*, *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 219 (4th Cir. 2002).

These well-understood dynamics apply even more so to the police. We have long recognized the "undoubted need for mutual trust and confidence within any law enforcement agency." *Jones v. Dodson*, 727 F.2d 1329, 1338 (4th Cir. 1984). "[G]iven the high stakes involved" in on-the-ground police work, including "life and death decisions," "the risks of disharmony can be grave." *Egger v. Phillips*, 710 F.2d 292, 319 (7th Cir. 1983) (en banc). "The need for confidentiality" also "cannot be gainsaid." *Id.* Law enforcement officials often must keep information private to, say, protect an informant's safety or prevent the suspects in an investigation from learning about ongoing surveillance.

Untrustworthy officers risk undermining these critical objectives. So too do they impede the work of prosecutors, who generally rely on the police for evidence and testimony. *See* 4 Wayne R. LaFave et al., *Criminal Procedure* § 13.1(a), at 125–26 (4th ed. 2015). If officers cannot be trusted to dutifully perform investigations and truthfully relay their findings, criminal cases can hardly be trusted to yield just outcomes. In short, just as

29

we must place "community trust" in the police, *Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016), the police must place trust in their colleagues.

Johnson breached this duty of candor. Her colleagues cannot rely on her to honestly report criminal behavior or not to cover it up. Indeed, not only did she repeatedly provide "false statements" during the police investigation into the altercations at Norma Jean's, but she also assaulted a patron there and failed to tell her supervisors about doing so. *Harrison v. Johnson*, Nos. 1209, 1229, 1230, 2021 WL 4841134, at *4 (Md. Ct. Spec. App. Oct. 18, 2021). Just ask the administrative trial board that presided over her case: after two days of reviewing evidence amassed over a two-year investigation, it "sustained" all the charges against Johnson. J.A. 57. That is, it found her guilty of everything. J.A. 101, 103; *see also* Balt. Police Dep't Pub. Integrity Bureau, *Internal Operations and Training Manual* 121 (Sep. 2020) ("'Sustained,' means where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur."). The majority's attempt to interpret this conclusion as reflecting something other than culpability, *see* Maj. Op. at 6 n.5, makes less than little sense.

The adjudicatory process was perfectly fair, too. Johnson knew about the investigation into her misconduct nearly three years before her hearing, even receiving the BPD's own "case file" about her a month in advance of the proceedings. J.A. 55. Before the trial board, she enjoyed the right to present evidence and cross-examine witnesses. Md. Code Ann., Pub. Safety § 3-107(e)(2), (4) (2021), *repealed by* Maryland Police Accountability Act, 2021 Md. Laws ch. 59. And across the investigation and hearing, she was represented by counsel. *Id.* § 3-107(e)(3); J.A. 55. Small wonder, then, that Johnson

30

admits there was nothing "wrong" with the "administration . . . of the trial board proceeding." Oral Arg. at 2:58–3:09.

True, her amended complaint alleges two officers committed "numerous errors and misconduct" during the investigation. J.A. 57. But it goes on to say that this alleged wrongdoing was "revealed and openly acknowledged at the trial board hearing." J.A. 57. In other words, the board had the opportunity to discount the findings and testimony of these two officers based on Johnson's countervailing evidence, yet it *still* found her guilty.

So to recap, Johnson says she was forced to resign after a yearslong investigation and fair two-day hearing culminated in her being found guilty of four serious offenses. This was no fly-by-night operation; the BPD gave Johnson plenty of time and opportunities to explain herself, seeking her termination only when the trial board decisively deemed her actions unacceptable. What exactly should her employer have done instead? Permitting Johnson to stay would have only burdened Baltimore's law enforcement with an officer that the BPD validly suspected was not to be trusted. How can a police department fight crime with someone who won't accurately report it? Imagine too the hit to morale when other members of the police force learn that their department was unable to dismiss from its ranks someone who had assaulted, concealed, and lied in connection with the incident at Norma Jean's nightclub. What are other officers supposed to think?

Of course, these very problems were, and continue to be, at the top of the BPD's mind. In 2016, the Department of Justice found a host of lamentable issues marring Baltimore's police. *See generally* U.S. Dep't of Just., *Investigation of the Baltimore City Police Department* (Aug. 10, 2016). Among them were the "lack[]" of "meaningful

31

accountability systems to deter [police] misconduct," *id.* at 10, and numerous "unethical" officers who demonstrated poor "credibility and integrity," *id.* at 151. In response, the BPD entered into a consent decree wherein it committed to developing "[a] robust and well-functioning accountability system." Consent Decree at 112, *United States v. Police Dep't of Balt. City*, No. 17-cv-99 (D. Md. Apr. 7, 2017), ECF No. 2-2. And the BPD has since "undergone significant changes," *Lilly v. Balt. Police Dep't*, 694 F. Supp. 3d 569, 590 n.14 (D. Md. 2023), "ma[king] notable achievements in" its "misconduct investigations and discipline," Balt. Consent Decree Monitoring Team, *Third Comprehensive Reassessment* 9 (Oct. 8, 2025). The inquiry into Johnson occurred amid this commendable initiative, and her resignation only furthered the good progress that the BPD has made. I would not set back Baltimore law enforcement's constructive efforts at much-needed reform.

## II.

Doing otherwise, the majority prolongs Johnson's ill-fated lawsuit in the name of Title VII. In particular, it reasons that she adequately alleged that thirteen similarly situated nonblack employees at the BPD received better treatment than her, which, if true, would support her race discrimination claim. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Examination of Johnson's amended complaint, however, readily reveals that these proposed comparisons are far too imprecise and vague to have any worth.

Consider first how Johnson herself frames the attempted analogues. Each of these other employees, her amended complaint reads, kept their jobs despite being "suspected of misconduct or other severe offenses." J.A. 50. The majority does the same thing, stating that Johnson "was charged" with various offenses. Maj. Op. at 14. But Johnson's

32

wrongdoing was not merely "suspected" or "alleged." To reiterate, she was found guilty after the BPD performed a diligent investigation and hearing into her commission of assault, noncommunication thereof, and recurring dishonesty. As the district court noted, this difference alone dooms the validity of many of her proposed comparators. Surely an employer does not run afoul of Title VII by more strictly disciplining an employee who is proven—not just rumored—to be a bad apple. *See, e.g.*, *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 715–16 (4th Cir. 2024) (distinguishing employee formally investigated for misconduct after concrete allegations by an identified subordinate from a proposed comparator merely "rumored" to have done the same thing); *Hurst v. District of Columbia*, 681 F. App'x 186, 192 (4th Cir. 2017) (per curiam) (distinguishing employee found guilty of a felony from a proposed comparator with suspected criminal history). Tellingly, despite the appellee emphasizing the district court's good observation on this point, the majority never directly acknowledges that the trial board found Johnson guilty. *See* Response Br. at 13 ("As the district court observed, 'none of the proffered comparators are availing, as none were accused of and found guilty following a trial board of misconduct similar to [Johnson].'" (emphasis omitted) (quoting J.A. 101)).

Accounting for culpability leaves six so-called peers, each of whom the complaint, when read charitably, states had at one point been deemed guilty of various offenses. But to the extent those decisions were even reached by a trial board, they all differ from Johnson's case in meaningful ways. Most notably, none were found guilty of tendering false statements during investigations into the commission and concealment of their own assault. This makes all the difference. One of "the most likely sources of different but

33

nondiscriminatory treatment" is "the nature of the offenses committed." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985). As this court has written time and again, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).

The majority stresses repeatedly that "a perfect one on one fit" among comparators is not required. Maj. Op. at 14. But its failure to find a "fit" among the multiple possibilities in the force comes pretty close to acknowledging that Johnson's situation was, in fact, different and unique. Once again, as the district court noted, "none of the proffered comparators are availing, as none were accused of and found guilty following a trial board of misconduct similar to Plaintiff." J.A. 101. The district court got this exactly right, and it is disappointing that its careful logic now fails to warrant due respect.

Other key factors only further undermine Johnson's proposed comparators. Nowhere does she allege, for instance, that any of these purported analogues "dealt with the same supervisor," a requirement "to establish a valid comparator." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (per curiam)). In fact, although the majority claims otherwise, nine were not even rank-and-file police officers, as Johnson was; they held "differen[t] . . . positions" within the BPD, which would ordinarily render any "purported comparison" to them "too loose." *Lightner*, 545 F.3d at 265.

Finally, there is reason to believe that at least one proposed comparator highlighted by the majority, Marlon Koushall, may belong to the same protected class as Johnson. After

34

all, in its first dismissal of Johnson's case, the district court wrote "Koushall is also Black." J.A. 31 n.8. And in related litigation stemming from the affairs at Norma Jean's, Johnson's own counsel has described Koushall as "a black male police officer." *Wiggins v. Balt. Police Dep't*, No. 22-1089, 2023 WL 6381515, at *2 (D. Md. Sep. 29, 2023). So while Johnson's amended complaint and the majority now refer to Koushall as nonblack, the district court rightfully doubted "whether [Johnson]'s allegation with respect to Koushall's race is entitled to the assumption of truth." J.A. 102 n.12.

Johnson and the majority try to downplay these many defects by emphasizing how, at the motion-to-dismiss stage, the plaintiff need only provide a "short and plain statement of [her] claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2). But the text of this rule is not the get-out-of-comparators-free card they make it out to be. Johnson's claim must still be "plausible on its face," providing "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And her amended complaint, even assuming its truth, misses this mark; each of its proposed comparators differs from her in rank, misconduct, or culpability—often all three at once.

Normally, this sort of imprecision warrants dismissal for failure to state a claim. *See, e.g.*, *Seabrook v. Driscoll*, 148 F.4th 264, 271 (4th Cir. 2025) (affirming dismissal of Title VII claim because proposed comparators differed in position and misconduct). And doing so here could not have caught Johnson by surprise; the district court had already dismissed her first complaint under Federal Rule 12(b)(6), exercising its discretion in

35

granting her leave to amend to correct its many deficiencies. *See* Fed. R. Civ. P. 15(a)(2). But Johnson did not learn her lesson. Instead, she filed an amended complaint that, while longer, failed to meaningfully resolve the qualms raised regarding the first version. The district court was thus right to dismiss her case again. By holding otherwise, the majority disregards not just our own case law, but the Supreme Court's familiar plausibility pleading standard.

## III.

My friends in the majority stress that that they "take no issue with" the BPD holding officers accountable and seek only to "ensure" that it "does so in a nondiscriminatory manner." Maj. Op. at 17. Of course we respect the nondiscrimination mandate embodied in our landmark civil rights laws. But Title VII suits cannot by themselves accomplish what is needed in the way of police reform. That requires judicial support for sound internal accountability, which is a far more immediate presence in officers' lives than an often-delayed Title VII suit. Where, as here, the internal process has played itself out in a fundamentally fair and rigorous manner, it warrants judicial respect. It is, after all, lax police accountability and the absence of internal professional norms that have led to racially tinged incidents that have caused so much community, and indeed national, distress.

The BPD's alleged discipline of Johnson had nothing to do with race, and everything to do with the absence of trust. Against the amended complaint's scattershot list of proposed comparators, Johnson stands alone in being charged and found guilty—after two years of investigation and two days of fair adjudication—of assaulting a civilian,

36

failing to tell her supervisors about the attack, and twice giving false statements during a police investigation. The public wants police departments to assure accountability for misdeeds within their ranks, but the majority now stymies the BPD's commendable attempt to do so. Title VII does not punish a department for rightfully ridding itself of someone who was not only a detriment to the force's good morale, but also to its honest functioning. The district court's judgment should be affirmed in all respects.